STATE OF NORTH CAROLINA v. JAMES EDWARD THOMAS

No. 455A87

(Filed 14 August 1991)

**1. Jury § 7.14 (NCI3d) — murder — jury selection — peremptory challenges — no racial motivation**

Defendant in a murder and sexual offense prosecution was not entitled to a new trial based on the prosecutor's peremptory challenges against prospective black jurors where the trial court did not make a prima facie finding of discrimination but nevertheless required the prosecutor to explain each peremptory challenge of a black person. The United States Supreme Court has held that the issue of the prima facie case is moot where the prosecutor offers racially neutral explanations for his peremptory challenges and the court finds them to be true and not pretextual. Great deference is accorded the trial court's decision on the ultimate question of the prosecutor's discriminatory intent in peremptorily challenging jurors.

**Am Jur 2d, Jury §§ 173-176, 237.**

**2. Jury § 7.14 (NCI3d) — murder — jury selection — peremptory challenges of black prospective jurors — no state constitutional violation**

The peremptory removal of black prospective jurors in a murder and sexual offense prosecution did not violate Article I, Section 26 of the Constitution of North Carolina.

**Am Jur 2d, Jury §§ 173-176, 237.**

**3. Rape and Allied Offenses § 5 (NCI3d); Homicide § 21.6 (NCI3d) — first degree sexual offense — felony murder — sufficiency of the evidence**

The trial court did not err by denying defendant's motion to dismiss charges of first degree sexual offense and felony murder where the victim may have been dead when the sexual offense occurred. It is unnecessary to decide whether the victim was alive when the offense was committed because the sexual act was committed during a continuous transaction that began when the victim was alive.

**Am Jur 2d, Rape § 41.**

4. **Searches and Seizures § 4 (NCI3d) — nontestimonial identification order — no warrant — admissible**

The trial court did not err in a prosecution for first degree sexual offense and murder by admitting evidence of defendant's fingernails, pubic hair, teeth, saliva, and lips obtained pursuant to a nontestimonial identification order because that evidence was properly obtained while defendant was in police custody. Obtaining a blood sample pursuant to the same order, without a search warrant, was harmless error beyond a reasonable doubt because, in addition to other incriminating evidence, defendant admitted being at the crime scene, passing out during an argument with the victim, awaking to find her dead, and leaving traces of his blood in the room.

**Am Jur 2d, Rape § 61.**

**Physical examination or exhibition of, or tests upon, suspect or accused, as violating rights guaranteed by Federal Constitution — Federal cases. 16 L.Ed.2d 1331, 22 L.Ed.2d 909.**

5. **Constitutional Law § 309 (NCI4th) — murder and sexual offense — concession of guilt — not ineffective assistance of counsel**

Defendant was not denied effective assistance of counsel in a prosecution for murder and sexual offense where defendant's counsel conceded to the jury that defendant had committed second-degree murder and had completed at least one element of the sexual offense. The trial court found on supporting evidence that defendant consented orally and in writing to counsel's strategy to admit his guilt to a charge of second-degree murder and nothing in the record contradicts that finding. The trial court also concluded that defense counsel never conceded defendant's guilt of a sexual offense and, for jurors to convict defendant under the trial court's instructions, they had to reject defense counsel's view of the facts.

**Am Jur 2d, Criminal Law §§ 967 et seq.**

6. **Rape and Allied Offenses § 6 (NCI3d) — sexual offense — requested instruction that victim must be alive — denied — no error**

The trial court did not err in a prosecution for first degree sexual offense and murder by denying defendant's requested instruction that the jurors had to first find that the victim was alive when sexually assaulted in order to find defendant guilty of the sexual offense. The requested instruction was

STATE v. THOMAS

[329 N.C. 423 (1991)]

not a correct statement of North Carolina law, and the North Carolina Supreme Court has previously applied the continuous transaction doctrine to a sequence of sexual offense and murder.

**Am Jur 2d, Rape § 108.**

7. **Criminal Law § 1352 (NCI4th) — murder — sentencing — McKoy error**

A sentence of death in a first-degree murder prosecution was vacated and the case remanded for a new sentencing hearing where the trial court instructed the jury to find any mitigating circumstances unanimously and to reject those not unanimously found to exist. The error was prejudicial because defendant's testimony could support a reasonable inference that defendant was under the influence of heroin at the time of the crime and that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was impaired. The circumstance is statutory and therefore deemed to have mitigating value.

**Am Jur 2d, Trial §§ 888-894.**

Justice MEYER did not participate in the decision of this case.

APPEAL pursuant to N.C.G.S. § 7A-27 from judgments imposing a death sentence upon conviction of first-degree murder (86CRS043829) and a mandatory life sentence upon conviction of first-degree sexual offense (86CRS044695). Judgments entered at the 6 July 1987 Criminal Session of Superior Court, WAKE County, *Farmer, J.*, presiding. Execution stayed 24 August 1987 pending defendant's appeal. Heard in the Supreme Court 11 May 1989. Findings on remand entered 21 March 1991 by *Cashwell, J.*, and filed with this Court on 15 May 1991.

*Lacy H. Thornburg, Attorney General, by J. Michael Carpenter, Special Deputy Attorney General, for the State.*

*Thomas F. Moffitt for defendant-appellant.*

EXUM, Chief Justice.

Defendant raises the following issues in his assignments of error in the guilt phase of his trial: (1) whether the prosecutor peremptorily challenged potential jurors solely on the basis of race;

(2) whether the evidence was sufficient to support defendant's convictions for felony sex offense and first-degree felony murder; (3) whether the trial court committed reversible error in admitting nontestimonial evidence taken without a search warrant; (4) whether certain concessions by defense counsel of defendant's guilt before the trial jury deprived defendant of his right to counsel; and (5) whether the trial court committed reversible error in refusing to instruct jurors about sexual assault as an afterthought to murder. We find no error in the guilt phase of defendant's trial. The decision in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990), requires that we remand for a new sentencing hearing.

I.

The State's evidence at trial tended to show the following:

In the early afternoon of 14 June 1986, the body of Teresa Ann West was discovered at the Sir Walter Tourist Home in Raleigh. Her body was scratched and bruised, and injuries appearing to be human bite marks were found on her breasts. A telephone receiver was found inserted in her vagina. A forensic specialist performed an autopsy and estimated the victim, manager of the Tourist Home, died sometime around midnight the night before. The expert testified that the victim had been strangled both manually and with pantyhose used as a garrote and that the telephone receiver probably was inserted in the victim's vagina after she was dead.

Defendant had lived at the Tourist Home for approximately five months before moving to his girlfriend's apartment in Cary, North Carolina, in June 1986. On the night of 13 June 1986 a roommate, Eddie Corley, let defendant use his car, a 1985 blue Monte Carlo. Defendant said he was going out to buy beer. At 10:55 that night a Raleigh police officer cited defendant for speeding on a road leading into Raleigh from Cary. One resident of the Tourist Home recalled seeing an unfamiliar blue car in the boardinghouse's driveway at approximately 11:30 p.m.

Defendant's girlfriend, Sandy Jordan, testified that defendant returned to their Cary apartment at 6 a.m. on 14 June. Defendant and Jordan were called to the police station at 8 p.m., and defendant requested that Jordan call his brother-in-law and ask him to hide the shirt defendant had worn the night before. Defendant himself later telephoned his stepbrother and told him to hide

the shirt because it had heroin on it. When the stepbrother hid the shirt he noticed a bloodstain on the collar. Defendant and Jordan returned to their apartment with detectives at about 11 p.m. The police asked defendant for the clothing he wore on 13 June, and defendant gave detectives the wrong shirt and pants. When detectives realized defendant had given them the wrong clothes, they obtained a search warrant for the apartment, returned there, and found the correct clothing.

The State presented several forensic experts who testified about physical evidence obtained from the crime scene and from defendant's clothing tending to place defendant in the victim's apartment on the night of her murder. Defendant's palm print was found inside the bathtub, which had been scrubbed clean the morning before West's death. The print of defendant's left little finger was found on the back of the telephone base, and the print of his left palm was found on the inside of the victim's bedroom door. Fibers found under the victim's fingernails, on her body, and on the bedsheets matched fibers from the shirt defendant wore the night the victim was killed. Fibers from the victim's bathmat were found on defendant's shirt and the victim's nightshirt. Feathers consistent with the victim's pillow were found on her torso and on defendant's shirt. Carpet fibers from the car defendant drove on 13 and 14 June were found on the victim's nightshirt.

The State also compared evidence from the crime scene with physiological evidence obtained from defendant's person. Police obtained samples of defendant's blood, hair, fingernails, teeth, and lips in a procedure following a nontestimonial identification order served on defendant the day after his arrest. A serologist testified that blood on a piece of tissue found in the victim's apartment was consistent with the defendant's blood. An expert in forensic hair analysis testified that hair consistent with defendant's was found in the victim's pubic hair and on a sheet underneath the body. An expert in forensic odontology who examined injuries on the victim's breasts and took dental impressions from the defendant offered his opinion that the injuries were bite marks left by defendant's teeth.

Defendant testified that he and the victim became friends after he moved into the Tourist Home in early 1986. He then moved to Cary to live with Jordan. On the night of Friday, 13 June 1987, defendant borrowed Corley's blue Monte Carlo and drove to the

boardinghouse to visit West. She let him in her apartment and said she had obtained heroin for him. After visiting Raleigh taverns in an unsuccessful attempt to find cocaine to use with the heroin, defendant returned to West's room. West gave defendant a syringe filled with heroin and he injected it into his arm. He then became nauseous and crawled into the bathroom and vomited. He dabbed the injection wound on his arm with some tissue. When defendant returned to West's bedroom, she asked him to have sex with her. He declined, saying he loved his girlfriend and was physically incapable of sex because of the heroin. West gave him some pills she said would keep him conscious, and he dissolved them and injected them. West then threatened to telephone a friend who was a law enforcement officer and report that defendant was wanted by police in California. West picked up the telephone receiver and pointed it at defendant. He stood up from the floor and asked if she was serious about having him arrested. She said she was. Defendant's next recollection was waking up at 4:45 a.m. or 5:44 a.m. and finding West dead. He placed a pillow over her face, collected his belongings, and ran from her room. He drove back to Cary, went to bed and got up to go to work later that morning.

Defendant also presented expert testimony tending to contradict the State's evidence matching defendant's dental impressions to the injuries found on the victim's breasts.

The jury found defendant guilty of first-degree murder both by premeditation and deliberation and under the felony murder rule, and guilty of first-degree sexual offense. The jury found defendant not guilty of common-law robbery and not guilty of larceny.

At the sentencing proceeding following defendant's conviction for first-degree murder, the State introduced evidence that defendant had pleaded guilty and served a prison term in California for armed robbery. Defendant called friends, family members, and a guard from a prison where he was previously incarcerated to testify about his good character. Defendant then testified that he had abused drugs since his stepfather introduced him to marijuana at age twelve. He said he committed the armed robbery in California to pay off cocaine debts. He expressed remorse for the victim's death but did not admit killing her. On cross-examination defendant admitted he was angry with the victim when she threatened to call police about outstanding California arrest warrants.

STATE v. THOMAS

[329 N.C. 423 (1991)]

The trial court submitted four aggravating circumstances for the jury's consideration: (1) defendant had been previously convicted of a felony involving the use or threat of violence to another person; (2) the murder was committed while defendant was engaged in a sexual offense; (3) the murder was committed to disrupt or hinder the enforcement of laws; and (4) the murder was especially heinous, atrocious, or cruel. The jury found the first three to be aggravating circumstances.

The trial court submitted nine mitigating circumstances for the jury's consideration. The jury unanimously found three of these circumstances but did not find six others, including that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

The jury unanimously found that the aggravating circumstances outweighed the mitigating circumstances and recommended the death sentence.

## II. GUILT PHASE

### A.

[1] Defendant contends he is entitled to a new trial because the prosecutor violated his state and federal constitutional rights by peremptorily challenging prospective jurors solely on the basis of ra ce. Article I, Section 26 of the Constitution of North Carolina prohibits racially based peremptory challenges. *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988). The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution also prohibits such discrimination. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Defendant further contends the prosecutor's peremptory challenges against prospective black jurors violated his rights under the Sixth and Eighth Amendments of the United States Constitution and Article I, Section 24 of the Constitution of North Carolina.[1]

---

1. Since arguments were heard in this case, the United States Supreme Court has held that the Sixth Amendment does not apply to protect criminal defendants from racially discriminatory peremptory challenges by the State. *Holland v. Illinois*, 493 U.S. 474, 107 L. Ed. 2d 905 (1990). Although defendant mentions the Eighth Amendment to the United States Constitution as well as Article I, Sections 19 and 24 of the Constitution of North Carolina in his assignment of error to the prosecutor's peremptory challenges, defendant makes no separate argument based on these latter provisions and does not explain how they might apply here. Therefore any contention based on these provisions is deemed abandoned. N.C. R. App. P. 28(a).

STATE v. THOMAS

[329 N.C. 423 (1991)]

At the start of jury selection defense counsel renewed a pretrial motion to prohibit the prosecution from peremptorily challenging any black person. The trial court deferred ruling on the motion until the prosecutor peremptorily challenged a black person. The prosecution challenged Juror 4, who was black, giving as his reason that she had read about the case and might have formed an opinion about it. The trial court ruled that the State had not challenged Juror 4 on account of race, did not purposely discriminate on the basis of race, and that excusing Juror 4 did not violate the Equal Protection Clause of the Fourteenth Amendment. This procedure was repeated each time the prosecutor peremptorily challenged a black person. The prosecutor peremptorily challenged a total of seven blacks, in each instance stating a reason unrelated to race. The trial court allowed each challenge, in each instance ruling that no discrimination had occurred. At the conclusion of jury selection, the trial court entered an order including findings of fact in regard to each of the prosecutor's peremptory challenges to blacks and a conclusion that as a matter of law there was no purposeful racial discrimination by the prosecutor in jury selection. The order stated that the trial court did not determine that defendant had made a prima facie showing of discrimination but the trial court nevertheless required the prosecutor to explain each peremptory challenge of a black person.

The trial court's findings of fact stated that the prosecutor peremptorily challenged black venirepersons for the following reasons: one had read about the case; one was young and unmarried, and not as stable and mature as the State preferred; one had never before thought about the death penalty and appeared evasive; one was young and stated that serving on the jury would work hardship on his job because he traveled a lot; one felt that drug use was a mitigating circumstance; one would not convict defendant without an eyewitness to the crime and proof by the State beyond a shadow of a doubt; and one felt the use of drugs would be an excuse.

Defendant contends the trial court erred in failing to determine that he had made a prima facie showing of racial discrimination. The United States Supreme Court recently held that where the prosecutor offers racially neutral explanations for his peremptory challenges and the trial court finds them to be true and not pretextual, the issue of the prima facie case is moot. *Hernandez v. New York*, --- U.S. ---, 114 L. Ed. 2d 395, 405 (1991). Therefore, the only remaining issue is whether the trial court erred in ruling

that defendant failed to meet his ultimate burden of showing purposeful racial discrimination.

This Court has identified several factors in addition to the prosecutor's explanations that may be relevant to the issue of racial discrimination in peremptory challenges. The defendant's race, the victim's race, and the race of key witnesses may suggest whether the case is susceptible to racially discriminatory jury selection. *State v. Smith*, 328 N.C. 99, 120, 400 S.E.2d 712, 724 (1991); *see State v. Crandell*, 322 N.C. 487, 502, 369 S.E.2d 579, 588 (1988). Also relevant are questions and statements by the prosecutor during jury selection which tend to support or refute a showing of discrimination. *Smith*, 328 N.C. at 121, 400 S.E.2d at 724-25 (1991); *State v. Robbins*, 319 N.C. 465, 489, 356 S.E.2d 279, 293 (1987). Also indicative of racial discrimination is the prosecution's "use of a disproportionate number of peremptory challenges to strike black jurors in a single case." *Robbins*, 319 N.C. at 490-91, 356 S.E.2d at 294. On the other hand, one factor tending to refute a showing of discrimination is the State's acceptance of black jurors. *State v. Smith*, 328 N.C. at 121, 400 S.E.2d at 726.

That defendant here is black and the victim was white gives support to defendant's contentions, because a case involving different races provides a motive for racially discriminatory peremptory challenges. The record reveals no question or statement by the prosecutor during jury selection that suggests any discriminatory intent. Defendant urges this Court to consider as a factor that the prosecution peremptorily challenged blacks at a proportionately higher rate than whites. Of eight black members of the venire not excused for cause, the prosecutor peremptorily challenged seven. Of thirty-seven white members of the venire not excused for cause, the prosecutor peremptorily challenged eight. Another circumstance, however, tends to refute a showing of purposeful discrimination. The first venireperson whom the prosecutor accepted for the jury was black.

Defendant for the first time on appeal contends the prosecutor's racially neutral explanations for peremptory challenges against blacks were pretextual. This Court has held that a prosecutor's racially neutral explanations for peremptory challenges must be "clear and reasonably specific" and "related to the particular case to be tried." *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990). The specificity of the prosecutor's challenges and their relevance to

this trial are shown by the trial court's findings of fact. Defendant challenges the credibility of those explanations, however, noting that white members of the venire who revealed some of the same characteristics cited in those explanations were nevertheless seated on the jury. This argument falls short of showing discrimination in a practice as complex as jury selection, which we have recognized is "more art than science" and in which "[r]arely will a single factor control the decision-making process." *Id.* Therefore, "[s]o long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate "hunches" and past experience.'" *Id.* at 498, 391 S.E.2d at 151 (quoting *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. 1987) (en banc), *cert. denied*, 486 U.S. 1017, 100 L. Ed. 2d 217 (1988)).

In *Batson* the Supreme Court accorded great deference to the trial court's decision on the ultimate question of the prosecutor's discriminatory intent in peremptorily challenging jurors. 476 U.S. at 98, n.21, 90 L. Ed. 2d at 89, n.21. Just recently in *Hernandez v. New York*, the Court reiterated this extremely deferential standard:

> Deference to the trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will "largely turn on evaluation of credibility." . . . In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "particularly within a trial judge's province."

*Hernandez*, --- U.S at ---, 114 L. Ed. 2d at 409. The Court in *Hernandez* specifically held that it would not overturn the trial court's finding on the issue of discriminatory intent "unless convinced that its determination was clearly erroneous." *Id.* at ---, 114 L. Ed. 2d at 412.

[2]   We must address separately defendant's contention that racial discrimination in peremptory challenges of jurors violated his rights under Article I, Section 26 of the Constitution of North Carolina. Article I, Section 26 provides: "No juror shall be excluded from

jury service on account of sex, race, color, religion, or national origin." The same reasoning supporting the United States Supreme Court's deferential standard of review in *Batson* and *Hernandez* also counsels this Court, in our evaluation of the state constitutional issue, to yield great deference to the trial court's ruling that no purposeful discrimination occurred in this case. We therefore conclude that the peremptory removal of black prospective jurors in this case did not violate the state Constitution.

In light of all the relevant circumstances, we affirm the trial court's ruling that no purposeful racial discrimination occurred in the peremptory challenges of black jurors in this case. This ruling was supported by the trial court's findings of fact, which in turn were supported by the record. It is not enough for defendant to raise the mere possibility of discrimination. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985), *quoted in Hernandez*, --- U.S. at ---, 114 L. Ed. 2d at 412.

This assignment of error is overruled.

### B.

**[3]** Defendant contends the trial court erred in denying his motions to dismiss at the close of the State's evidence and again at the close of all the evidence the charges of first-degree sexual offense and first-degree felony murder because the evidence was as a matter of law insufficient to establish each element of those offenses. For the reasons discussed below, we disagree.

A defendant's motion for dismissal is properly denied if the trial court determines there is substantial evidence of (1) each element of the charge or of a lesser included offense and of (2) defendant's being the perpetrator. *State v. Mercer*, 317 N.C. 87, 96, 343 S.E.2d 885, 890 (1986). If the evidence is sufficient merely to raise a suspicion or conjecture as to any element of the offense, even if the suspicion is strong, the motion to dismiss should be allowed. *Id*. The evidence is to be examined in the light most favorable to the State. "The trial court's function is to test whether a *reasonable inference* of the defendant's guilt of the crime charged may be drawn from the evidence." *Id*. at 97, 343 S.E.2d at 891. The constitutional minimum standard required for due process is whether "*any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573 (1979), *quoted in State v. Earnhardt*, 307 N.C. 62, 66-67 n.1, 296 S.E.2d 649, 652 n.1 (1982).

A first-degree sexual offense as defined in N.C.G.S. § 14-27.4 includes a sexual act "[w]ith another person by force and against the will of the other person, and . . . employ[ing] or display[ing] a dangerous or deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon." The term "by force" does not necessarily mean physical force, but also means fear, fright, or duress. *State v. Locklear*, 304 N.C. 534, 284 S.E.2d 500 (1981). The term "against the will" requires that the offense be committed without the victim's consent, and a lack of consent is an essential element of sexual offense where the victim is an adult and not physically or mentally handicapped. *State v. Booher*, 305 N.C. 554, 290 S.E.2d 561 (1982). The term "sexual act" is defined in N.C.G.S. § 14-27.1(4) as "cunnilingus, fellatio, analingus, or anal intercourse," or "the penetration, however slight, by any object into the genital or anal opening of another person's body." Bites to the breast do not fall within this definition.

According to the State's evidence, the victim was alive when her breasts were bitten but probably was dead when the telephone was inserted in her vagina. Dr. Page Hudson, who examined the victim's body in his role as Chief Medical Examiner for North Carolina, testified that in his opinion, "it was somewhat more probable that she was dead than alive" when the telephone was inserted in her vagina. Dr. Hudson said he could not be certain whether she was dead or alive at that time, "but to me the medical aspects of the evidence were a little more for her being dead at the time she received that."

In the case *sub judice* it is unnecessary for us to decide whether the evidence was sufficient to allow a reasonable inference that the victim was alive when the sexual offense as defined in our statutes was committed. Because the sexual act was committed during a continuous transaction that began when the victim was alive, we conclude the evidence was sufficient to support defendant's conviction for first-degree sexual offense. This Court, on numerous occasions, has held that to support convictions for a felony offense and related felony murder, all that is required is that the elements of the underlying offense and the murder occur

STATE v. THOMAS

[329 N.C. 423 (1991)]

in a time frame that can be perceived as a single transaction. This principle is well illustrated by the case of *State v. Fields*, 315 N.C. 191, 337 S.E.2d 518 (1985), which the trial court below specifically relied upon in ruling on the nonsuit motion. In *Fields*, this Court set forth the test:

> A killing is committed in the perpetration or attempted perpetration of a felony for purposes of the felony-murder rule where there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is part of a series of incidents which form one continuous transaction.

*Id.* at 197, 337 S.E.2d at 522 (quoting *State v. Hutchins*, 303 N.C. 321, 345, 279 S.E.2d 788, 803 (1981)).

Defendant in *Fields* stated that he took the murder victim's shotgun only as an afterthought and after the victim was dead. He argued that his intent to steal only arose after the killing and that a corpse is incapable of possessing personal property. In rejecting this, this Court stated:

> To accept defendant's argument would be to say that the use of force that leaves its victim alive to be dispossessed falls under N.C.G.S. 14-87, whereas the use of force that leaves him dead puts the robbery beyond the statute's reach. That the victim is already dead when his possessions are taken has not previously been an impediment in this jurisdiction to the defendant's conviction for armed robbery. *See, e.g., State v. Webb*, 309 N.C. 549, 308 S.E. 2d 252 (1983). All that is required is that the elements of armed robbery occur under circumstances and in a time frame that can be perceived as a single transaction. When, as here, the death and the taking are so connected as to form a continuous chain of events, a taking from the body of the dead victim is a taking "from the person." *See* 67 Am. Jur. 2d *Robbery* § 14 at 65 (1985).

*Id.* at 201-02, 337 S.E.2d at 524-25 (footnotes omitted).

This Court has for many years applied the same doctrine to sexual offense and murder occurring in a continuous chain of events. In *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), we upheld defendant's conviction for first-degree murder committed during the perpetration of sexual offense—repeatedly forcing a mop handle into a woman's

vagina after beating her, resulting in her death. We held as follows: "It is immaterial whether the felony occurred prior to or immediately after the killing so long as it is part of a series of incidents which form one continuous transaction." *Id.* at 67, 301 S.E.2d at 348.

Because there is sufficient evidence to support the inference that the victim here was strangled and subjected to a sexual offense within an uninterrupted period of time, and because breast bite marks were inflicted, according to Dr. Hudson, prior to her death, and because of the overwhelming fiber evidence obtained from the victim's body, an inference arises that her death occurred pursuant to a continuous sexual assault. While the first-degree sexual offense (the insertion of the receiver into her vagina) could have occurred before or after the victim's death, clearly, it occurred near the time of the victim's final demise during a continuous transaction.

The precise timing of the insertion of the telephone receiver into the victim's vagina is irrelevant if it occurred during a continuous transaction. All of the evidence clearly suggests that the sexual offense and the death of the victim were "so connected as to form a continuous chain of events." *Fields*, 315 N.C. at 202, 337 S.E.2d at 525.

In the case of *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980), which defendant cites, defendant was charged with armed robbery, first-degree rape, and first-degree murder in the perpetration of first-degree rape. Although this Court found, under the facts of that case, that there was a sufficient break in the causal chain to justify the dismissal of the armed robbery charge, the Court sustained the felony murder based on the first-degree rape. This holding was based on evidence from the autopsy which showed that the bruises to the victim's vagina occurred within a half hour or within a few minutes *after her death*. Thus, *Powell* held that defendant's motion to dismiss the charge of first-degree murder (relying on the rape) was properly denied. *Id.*

In summary, defendant's motion to dismiss here was properly denied in that there was sufficient evidence that the sexual offense for which defendant was convicted was committed in conjunction with the murder as part of a continuous chain of events, forming one continuous transaction.

For the same reasons as stated above, the trial court also properly denied defendant's motion to dismiss the charge of first-degree felony murder.

## C.

[4] Defendant contends he is entitled to a new trial because the trial court erroneously admitted nontestimonial evidence — samples of defendant's blood, hair, saliva, fingernails, and molds of his teeth, lips, and fingernails — taken by police without a search warrant. Because defendant testified under direct examination that he was at the scene of the crime and also testified that he sustained a bleeding wound to his arm, we conclude that any error in admitting evidence of his blood sample was harmless beyond a reasonable doubt.

The day following defendant's arrest, Superior Court Judge Donald W. Stephens granted a request by the prosecutor for a nontestimonial identification order providing that defendant, who was in police custody, be taken to the state's Chief Medical Examiner for identification procedures. The medical examiner took samples of defendant's head and pubic hair, blood, saliva, and fingernails. The examiner also made molds of defendant's teeth, lips, and fingernails, and took photographs of defendant's mouth and teeth.

Before trial, defense counsel moved to suppress the evidence on grounds that the state and federal constitutions require police to obtain a search warrant based on probable cause before taking blood and other personal identification samples of a defendant already in custody. Superior Court Judge Donald L. Smith denied the motion, relying on the "good-faith exception" recognized in *State v. Welch*, 316 N.C. 578, 342 S.E.2d 789 (1986). Judge Smith questioned the application of that exception, however, because *Welch* involved police reliance on a search warrant requiring probable cause, while the instant case involved police reliance on a nontestimonial identification order requiring a lesser standard of belief than probable cause.

Thereafter, the prosecutor obtained a search warrant authorizing the Chief Medical Examiner's office to obtain the same personal identification evidence from defendant again. Defendant resisted service of that warrant and for reasons not revealed in the record, the warrant was never executed. The prosecutor therefore relied on the nontestimonial identification order when he introduced the evidence at trial.

During direct examination in the guilt phase of his trial, defendant testified that he had visited the victim in her room the night of her death. He testified that he injected heroin and sustained a bleeding wound to his arm, to which he applied a small piece of tissue paper from the victim's bathroom. He further testified that he blacked out and later awoke to discover the victim was dead.

In *State v. Carter*, 322 N.C. 709, 724, 370 S.E.2d 553, 562 (1988), this Court held that there is no good-faith exception under the state constitution to the requirement that a search warrant be obtained before a blood sample may be taken from a defendant. The Court in *Carter* noted that taking a sample of blood is a particularly intrusive search, and that a defendant's blood type is constant and therefore not susceptible to spoilage or dissipation over the passage of time. With respect to the taking of defendant's blood, this case involves the same procedural error identified in *Carter*—police acted in reliance upon a nontestimonial identification order when a warrant was required. Because this error violated defendant's constitutional rights, he is entitled to relief unless we determine the error was harmless beyond a reasonable doubt.

Unlike defendant in *Carter*, defendant here has admitted to being at the crime scene. He testified that he passed out during an argument with the victim and awoke to find her dead. He also admitted leaving traces of his blood in her room. In light of this and other evidence incriminating defendant in the victim's death, the trial court's error in admitting evidence obtained under the nontestimonial identification order was harmless beyond a reasonable doubt.

The trial court committed no error in admitting evidence of defendant's fingernails, pubic hair, teeth, saliva, and lips, because that evidence was properly obtained while defendant was in police custody. *State v. Irick*, 291 N.C. 480, 490, 231 S.E.2d 833, 840 (1977).

D.

[5] The next assignment of error presents defendant's contention that he was denied his Sixth Amendment right to effective assistance of counsel when defense counsel, without defendant's consent, conceded to the jury that defendant had committed second-degree murder and had completed at least one element of the sexual offense.

The test for ineffective assistance of counsel is the same under both the federal and state Constitutions. *State v. Braswell*, 312

N.C. 553, 324 S.E.2d 241 (1985). A defendant is entitled to relief if he can show both (1) that his counsel's performance fell below an objective standard of reasonableness, and (2) that his counsel's deficient representation was so serious as to deprive him of a fair trial.

During arguments to the jury, defense counsel, apparently as a matter of trial strategy, conceded that defendant was guilty of second-degree murder and that defendant had inserted the telephone receiver into the victim's vagina. Defense counsel stated to the trial court at a bench conference that defendant had authorized the admission of guilt to second-degree murder. Defendant on appeal denies he consented. After oral arguments were heard on this appeal, we ordered this case be remanded to the Superior Court, Wake County, for an evidentiary hearing to determine whether defendant in fact consented. *State v. Thomas*, 327 N.C. 630, 397 S.E.2d 79 (1990).

Following a hearing at the 28 January 1991 Criminal Session of Wake County Superior Court, the Honorable Narley L. Cashwell entered an order concluding as a matter of law that defendant freely, voluntarily, intelligently, and understandingly consented to his counsel's plan to admit his guilt of second-degree murder. The order also concluded as a matter of law that defendant did not consent to defense counsel's admission that he had committed a sexual act upon the victim's body. The order concluded ultimately, however, that in light of evidence that the victim was dead when assaulted and defense counsel's argument that therefore no sexual offense occurred, the admission did not concede defendant's guilt to the sexual offense charge and thus did not deprive defendant of a fair trial on that charge.

Judge Cashwell included in his order several detailed findings of fact, including the following: On a number of occasions, and with great frequency in the days immediately before the trial, defense counsel discussed with defendant the possible strategy of conceding guilt to second-degree murder, and conceding guilt to a sexual act after the victim was dead, but arguing that because the victim was dead when the sexual act occurred, defendant did not commit a sexual offense. One of two defense attorneys, co-counsel Johnny Gaskins, recommended this strategy to defendant, while lead counsel C. Dick Heidgerd advised against it. Defendant

agreed with Gaskins' strategy orally and signed a paper writing, prepared by both attorneys, to establish a record of his consent as follows:

> I, James Edward Thomas, authorize my attorneys, C.D. Heidgerd and Johnny S. Gaskins, to admit to the jury that I killed Teresa Anne West with malice but without premeditation and deliberation. My attorneys may ask the jury to convict me of second degree murder.
>
> I have talked with my attorneys about admitting to the jury that I am guilty of second degree murder and I understand the consequences.

The paper writing was dated 6 July 1987, the day defendant's trial began. After the writing was signed, jury selection began.

In *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), we held that ineffective assistance of counsel, in violation of the defendant's Sixth Amendment right to counsel, was established where defense counsel, without the defendant's consent, admitted the defendant's guilt, and recommended that jurors convict him of manslaughter rather than first-degree murder or find him not guilty. In that case, however, the State did not contest the defendant's assertion that he had not consented to his attorney's admission.

Here, the trial court has found on supporting evidence that defendant consented orally and in writing to counsel's strategy to admit his guilt to a charge of second-degree murder. Nothing in the record contradicts that finding. That finding supports the trial court's conclusion that defendant knowingly consented to the admission of his guilt on the second-degree murder charge.

The trial court also concluded that defense counsel never conceded defendant's guilt of a sexual offense. This conclusion was based on evidence in the trial record that the victim was likely dead when the sexual act occurred and defense counsel's argument that his client could not have committed a sexual offense against a corpse. For the following reasons, we agree with the trial court's conclusion.

In his closing argument to the jury regarding the sexual offense charge, defense counsel Johnny Gaskins made the following statements:

Don't let me mislead you to think that I in any way con-
done what occurred in the relationship in respect to the sexual
assault. . . .

Again, let me tell you that I don't in any way condone
what James Thomas did in that respect . . . .

In fact, it is illegal to do exactly what Dr. Hudson de-
scribed to you was done in this case, that is, to insert the
telephone receiver into her vagina after she was dead.
. . . It is the crime of . . . desecrating the body of the person
that is dead.

Mr. Gaskins also stated clearly to jurors that the State had not
charged defendant with the offense of desecrating a corpse.

In arguing to the jury about the felony murder rule, Mr. Gaskins
also anticipated the continuous transaction doctrine, which we cited
above in holding that the evidence supports defendant's conviction
of first-degree sexual offense and felony murder. Mr. Gaskins argued
as follows:

In order to prove that James Thomas is guilty of First
Degree Murder on [the felony murder] theory, the State must
prove that he was—he was there with the intent to commit
a felony which was inherently dangerous to human life.

Not that he killed her and that he then committed some
felony, . . . but that he was there for the purpose of committing
the felony, and that during the commission of the felony that
Teresa West was killed. . . .

If you find that James Thomas was there, exactly as he
says, and that in response to what Teresa West said . . .
he suddenly started strangling her and he killed her, and
. . . after having strangled her that he then committed a sexual
offense, then you have two separate things . . . .

If those things occurred they occurred after she was dead
*and are not so interrelated so as to bring this case within
the Felony Murder Rule.* . . .

I submit to you that the State has not proven that the
felony and that the murder was [sic] so interrelated as to
take this case out of the realm of Second Degree Murder.

STATE v. THOMAS

[329 N.C. 423 (1991)]

Following defense counsel's argument, the prosecutor argued that jurors could infer from the evidence that all of defendant's actions in the victim's room comprised a single, continuous chain of events sufficiently linking the strangulation and the sexual act to support convictions for sexual offense and felony murder. The prosecutor disputed defense counsel's argument that no such factual inference could be drawn from the evidence. The trial court's instructions to jurors addressed this disputed issue of fact:

> [I]t makes no difference whether the intent to commit . . . a sexual offense was formulated before the use of force or after it, *so long as the elements of . . . sexual offense occur under circumstances and in a time frame that you find to be a single transaction.*
>
> *That is, that the death and the . . . sexual offense was [sic] so connected as to form a continuous chain of events.*

The trial court did not instruct jurors that defense counsel's concession about defendant committing the sexual act constituted an admission of guilt to the sex offense charge.

For jurors to convict defendant under the trial court's instructions, they had to reject defense counsel's view of the facts. Unlike defense counsel in *Harbison*, who admitted his client's guilt and asked the jury to return a verdict of guilty of manslaughter, a lesser included offense on which defendant could have been convicted, defense counsel here did not admit defendant's guilt to first-degree sexual offense or to any lesser included offense. Rather, defense counsel held the State to its burden of proof on one element of the sexual offense charge: the issue of a continuous chain of events beginning while the victim was alive.

Because defense counsel did not admit defendant's guilt to the sexual offense of which he stood accused, defendant was not deprived of a fair trial. This assignment of error is overruled.

E.

[6] Defendant finally assigns error to the trial court's refusal to instruct jurors that defendant could not be found guilty of sexual offense if he committed the sexual act merely as an afterthought to killing the victim. For the following reasons, we find no reversible error.

## STATE v. THOMAS

[329 N.C. 423 (1991)]

Before the trial court instructed the jury, defendant requested the trial court to give an instruction that to find defendant guilty of sexual offense, jurors first had to find the victim was alive when sexually assaulted. The requested instruction stated:

> A crucial element of the crime of sexual offense is that a sex act must have been done against the person's will. The purpose of the law is to protect persons from physical abuse. The law cannot protect a person from physical abuse who is not alive.

> As such, the State must prove to you beyond a reasonable doubt that the victim was alive at the time of the sexual act in order to prove that the crime was against the person's will. If you do not so find that the victim was alive, then James Edward Thomas would only be guilty of desecrating the human remains of the victim.

The trial court instead instructed jurors, as quoted in our discussion of the immediately preceding assignment of error, that to convict defendant of sexual offense, they had to find that the killing and sexual act occurred "under circumstances and in a time frame that you find to be a single transaction." The trial court also required jurors to find that the death and sexual offense were "so connected as to form a continuous chain of events." Defendant objected to this instruction, arguing that the continuous transaction doctrine did not apply in sexual assault cases. The trial court overruled that objection.

"If a party requests an instruction which is a correct statement of the law and is supported by the evidence, the court must give the instruction at least in substance." *State v. Fullwood*, 323 N.C. 371, 390, 373 S.E.2d 518, 529 (1988) (citation omitted). "It need not give the instruction exactly as the party requests, however." *Id.*

Defendant's requested instruction was not a correct statement of North Carolina law. The legislature has not written into statute, nor has this Court ever ruled that to support a conviction for sexual offense, the State must prove that the victim was alive at the time of the sexual act. Additionally, this Court has previously applied the continuous transaction doctrine to a sequence of sexual offense and murder. *State v. Williams*, 308 N.C. 47, 67, 301 S.E.2d 335, 348, discussed earlier in this opinion, upheld defendant's conviction for felony murder during the commission of a sexual offense

without regard to whether the death or sexual offense occurred first. Under that decision, defendant's requested instruction here was erroneous and therefore the trial court properly rejected it. This assignment of error is overruled.

## III. SENTENCING PHASE

We now turn to capital sentencing issues.

[7] At the sentencing proceeding the trial court submitted nine mitigating circumstances for the jury's consideration. The jury unanimously found three of these circumstances to exist but failed to find six others, including the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1988 & Cum. Supp. 1990).

The trial court instructed the jury to find any mitigating circumstances unanimously and to reject those not unanimously found to exist. This instruction was error under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990). Such error requires us to order a new sentencing hearing unless the State can demonstrate beyond a reasonable doubt that it was harmless. *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990).

Defendant testified in his sentencing proceeding about his habitual abuse of drugs including LSD, cocaine, and heroin. Defendant began using drugs at age twelve, when he smoked marijuana belonging to his stepfather. At age 14 he was taking barbiturates and LSD. Defendant moved out on his own while still a teenager and lived in a "drug house" where people bought and used drugs. By age 20 defendant had fathered two children and robbed a fast food restaurant to pay a debt for cocaine. Defendant's father, James Mangum, testified that defendant lived with him just before moving to the Tourist Home and was smoking marijuana at that time.

When defendant lived at the Tourist Home, he fell in love with Sandy Jordan and promised to quit using drugs. On 13 June 1987, the night of the murder, defendant broke that promise and injected heroin into his arm at the Tourist Home, according to his testimony. That testimony was corroborated by a piece of tissue paper with defendant's blood on it found in the victim's room. Defendant testified that after injecting the drug in the victim's

room he became disoriented and blacked out, awaking later to find the victim dead.

Defendant's testimony could support a reasonable inference that defendant was under the influence of heroin at the time of the crime and, as a result, his ability to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was impaired. We cannot say beyond a reasonable doubt that absent the unanimity instruction no juror could have found the existence of this mitigating circumstance, weighed it in the final balancing process in deciding between life imprisonment and death and, having done so, concluded that life imprisonment should have been imposed. The improper instructions on this mitigating circumstance were prejudicial because the circumstance is statutory and, therefore, deemed to have mitigating value. *State v. Quesinberry*, 328 N.C. 288, 293, 401 S.E.2d 632, 634 (1991); *State v. Pinch*, 306 N.C. 1, 27, 292 S.E.2d 203, 224 (1982).

We therefore vacate the sentence of death and remand to Superior Court, Wake County, for a new sentencing proceeding in the first-degree murder case.

For the reasons stated above, we find no error in the sexual offense case and remand the murder case to the Superior Court, Wake County, for a new sentencing proceeding not inconsistent with this opinion or the opinion of the United States Supreme Court in *McKoy*.

First-Degree Murder 86CRS043829—No error in guilt determination. New sentencing proceeding.

First-Degree Sexual Offense 86CRS044695—No error.

Justice MEYER did not participate in the decision of this case.