STATE OF NORTH CAROLINA v. EAZED RUDOLPH MEEKINS

No. 363A87

(Filed 13 June 1990)

1. **Criminal Law § 73.3 (NCI3d)— murder—victim's fear of defendant—admissible**

There was no error in a prosecution for first degree murder, first degree burglary, first degree kidnapping, felonious larceny, and possession of stolen property from the admission of testimony from the victim's niece that the victim told her she was afraid of defendant. Where the voir dire testimony provided a plausible reason and factual basis for the victim's fear of defendant, the victim's fear of defendant was relevant to the issue of the relationship between the victim and the defendant, and there was no abuse of discretion in the trial

STATE v. MEEKINS

[326 N.C. 689 (1990)]

court's determination that the probative value of the testimony was not outweighed by its tendency to unfairly prejudice defendant. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Homicide §§ 329, 330.**

2. **Criminal Law § 86.5 (NCI3d) — statement by defendant to sheriff — other crimes — admissible**

The trial court did not err in a prosecution for first degree murder, first degree burglary, first degree kidnapping, felonious larceny, and possession of stolen property by allowing the sheriff to testify over objection that defendant had told him that the murderers had said they would trust defendant because he was wanted for raping a white girl. The statement by defendant that the murderers believed he was a fugitive was relevant to show why the murderers wanted defendant to join them; it added credibility both to the sheriff's testimony that the statement as related by the sheriff was made and to the statement itself, which conflicts with defendant's denial at trial that he was involved in the murder; and the trial court was well within its discretionary ambit in ruling the evidence admissible. N.C.G.S. § 8C-1, Rules 401 and 402.

**Am Jur 2d, Evidence §§ 320-327.**

3. **Criminal Law § 88.4 (NCI3d) — cross-examination — other offenses**

The trial court did not err in a prosecution for first degree murder, first degree burglary, first degree kidnapping, felonious larceny, and possession of stolen property by allowing defendant to be cross-examined about a pending rape charge where defendant had told a sheriff that the murderers had said that they could trust him because he was wanted for raping a white girl. The State's cross-examination of defendant was designed to show defendant's motive for the murder and theft of the victim's purse and car in that the State was trying to establish defendant's intent to flee from the pending charges. The State did not cross-examine defendant about the rape accusation to show that he was unworthy of belief because of his alleged bad act.

**Am Jur 2d, Evidence §§ 282, 283, 325, 326.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment sentencing him to life imprisonment in Case No. 86CRS1655 on a first-degree murder conviction imposed by *Williams, J.*, presiding, at the 16 February 1987 Criminal Session of Superior Court, CHOWAN County. Motion to bypass Court of Appeals on defendant's convictions for first-degree burglary and felonious larceny in Case No. 86CRS1656 and first-degree kidnapping in Case No. 86CRS1657 allowed 14 April 1988. Heard in the Supreme Court 13 December 1988.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for defendant appellant.*

EXUM, Chief Justice.

Defendant was properly indicted for first-degree murder, first-degree burglary, first-degree kidnapping, felonious larceny and possession of stolen property. He was found by a jury to be guilty as charged. After a sentencing hearing on the first-degree murder conviction the jury returned a recommendation of life imprisonment, which was imposed.[1] Judgment was arrested on the possession of stolen property conviction, and defendant was sentenced to terms of years on the other convictions.

Defendant contends his convictions should be vacated and that he is entitled to a new trial because of prejudicial error in the admission of certain evidence. We find no reversible error in defendant's trial.

I.

The State's evidence tends to show as follows:

---

1. In making its recommendation as to punishment, the following aggravating factors were found by the jury: The murder occurred while defendant was fleeing after committing burglary, it occurred during the course of a kidnapping, it was for pecuniary gain and was especially heinous, atrocious or cruel. The following mitigating factors were also found: Defendant's mental age, that defendant committed the murder while under the influence of a mental or emotional disturbance, that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, that this impairment was related to his limited intellectual capacity and also his lack of education or the level of education which he was able to perform. The jury found that the mitigating

STATE v. MEEKINS

[326 N.C. 689 (1990)]

On or about 29 April 1986 in the early morning the victim Ethel Owens, a 79-year-old widow, was abducted from her home in her own automobile, murdered in this automobile and her body left in a roadside ditch along a rural highway where it was found on 3 May 1986.

On the night of 28 April defendant was at a party in his aunt's trailer, which was described by a witness as being "three good rock throws away" from the victim's home. Defendant, wearing a green Army field jacket, was drinking liquor and wine with several other people. At approximately midnight defendant got upset and broke two glass bottles at the party. He later left, saying he was going jogging. At 4 a.m. on 29 April defendant woke Wanda Jean Lee, who had been at the party, and asked her for some clothes he had left with her earlier. He told Ms. Lee he had hitch-hiked to the house, which is forty-five minutes away from where the party took place. The next morning Ms. Lee found a woman's red and black housecoat in her apartment.

At about 5 a.m. on 29 April defendant visited James Overton and asked him for some clothes. Defendant was wearing shorts with bloodstains on them. He explained he had been in a fight with his brother. Overton recognized the car defendant was driving as the victim's. Overton asked for money and saw defendant remove eight dollars from a woman's purse inside the car. He observed that defendant also had some blank checks.

At 8:30 a.m. on 29 April the victim's great-niece, Cindy Williams, drove past the victim's house and noticed her car was missing. Later that day she entered the victim's home and noticed a mattress was partially off the bedframe and the sheets were thrown to one side. Beside the bed was a rolled undergarment. Unable to locate her great-aunt at other relatives' houses, Ms. Williams returned to the victim's house and called her parents. Her mother, the victim's niece, came to the victim's home and noticed it was unusually messy. She observed bloodstains on some sheets and an odor of urine from a recliner chair.

Sheriff Norman Newbern arrived at the crime scene at 7:30 p.m. on 29 April. He observed the door to a storage room of the residence had been broken into and a window screen placed against

---

factors were sufficient to outweigh the aggravating factors and recommended life imprisonment.

a wall inside the room. On the ground outside the window the sheriff found a paring knife and a zipper attached to some olive green cloth. Later that night S.B.I. investigators found finger and palm prints throughout the house. Six prints were later identified as defendant's. His right palm print and left thumbprint were on the screen's interior, and his right ring fingerprint was on the screen's exterior. His right and left thumbprints were on the door between the den and kitchen.

Melvin Burton, Wanda Jean Lee's boyfriend, testified he had been defendant's friend for several years. He recalled that defendant broke two bottles together at the 28 April 1986 party and visited Ms. Lee early the next morning. Burton saw defendant later that day and noticed a scratch on his forehead. Defendant explained he had been scratched by his brother during a basketball game. Defendant had some books of checks with him bearing the name of Ethel Owens. Defendant asked Burton to help him get some checks cashed. Burton took defendant to a service station in Elizabeth City, but the station refused to cash the checks. Later defendant and Burton were at a party drinking. While sitting on some back steps defendant began to cry. When Burton asked what was wrong, defendant replied, "I didn't mean to do it. I didn't mean to kill her." On cross-examination Burton testified that defendant said "I didn't mean to kill Ethel Owens."

Defendant was taken into custody for questioning just before midnight on 1 May 1986. He told officers he was with two men who killed Ethel Owens and disposed of her body. Defendant claimed he rode in the back of victim's car and was never in the front seat. The victim's car was found in the Albemarle Hospital parking lot on 2 May 1986. There were bloodstains matching the victim's type at the top of the passenger seat running down to the floor, on the kickboard under the passenger door and on the outside of the car. A knife was found on the floorboard of the car. Defendant's fingerprints were found on the steering wheel, the rearview mirror and the driver's armrest.

On 3 May Ethel Owens' badly deteriorated body was found in a roadside ditch. Her body was clad only in a housecoat. She had been stabbed nineteen times. Near the body was found a billfold containing the birth certificate of James Overton, which Overton had previously given defendant; a newspaper article about defendant; and a matchbook from the wedding of defendant's brother.

Defendant offered evidence tending to show as follows:

Melvin Burton, not defendant, had been wearing a green Army jacket at the party on 28 April 1986. Defendant testified that he got into an argument at the party, broke two wine bottles together and cut his hand. He rested on the back porch at the party for an hour, then hitchhiked to Burton's house. There Burton paid him fifty dollars to get rid of Ethel Owens' car. Defendant drove to James Overton's house to change pants. He then parked the victim's car in the hospital parking lot, where a girlfriend picked him up and drove him home. He later met with Burton and Wanda Jean Lee. Ms. Lee produced some personal checks bearing the victim's name, and defendant joined her as she unsuccessfully tried to cash the checks.

Defendant also testified that his mother had been Ethel Owens' housekeeper and that he had done some heavy lifting and repair work in the victim's home on two or three occasions, the most recent being some nine months before the murder.[2]

## II.

[1] Defendant first argues that the trial court erred in admitting certain testimony from the victim's niece, Elizabeth Sawyer. The trial court conducted a *voir dire* concerning the admissibility of this testimony. On *voir dire* Ms. Sawyer testified that the victim told her two weeks before her murder that she feared defendant because defendant had asked for one hundred dollars and she had refused to give it to him. The trial court then determined to admit the testimony under North Carolina Rule of Evidence 803(3), noting that "it relates to an existing mental or emotional state of mind of the declarant concerning her feelings about the defendant, Eazed Rudolph Meekins."

Ms. Sawyer then testified before the jury over defendant's objection that she had spoken to the victim two weeks before her death and that the victim told her "that she was afraid of Zeb Meekins." After this testimony, the court instructed the jury as follows:

Ladies and gentlemen of the jury, at this time let me instruct you that you are to consider this witness' testimony concerning

---

2. During cross-examination defendant was equivocal regarding when he was last in the victim's house. He testified that he might have worked in her house only several weeks or a few months before her death.

any statement made by Mrs. Ethel Owens only to the extent that you find that it indicates ill will or fear on the part of the victim by the Defendant or of the Defendant. You may consider it for no other reason in this case.

Ms. Sawyer then testified that the victim had previously said several times she was fearful of defendant.

Defendant contends that admission of this testimony was reversible error because the State failed to demonstrate a meaningful factual basis for the victim's fears, the testimony was irrelevant to any material issue in the case and any relevancy that did exist was outweighed by the tendency of the evidence unfairly to prejudice defendant.

In *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983), this Court held that evidence regarding a victim's fear of the defendant should be accompanied with some factual basis for that fear. We said:

> Evidence of a victim's fear of the defendant is subject to misuse. Therefore, the naked assertion by a victim prior to his death that he fears the defendant should not be admitted into evidence absent some evidence tending to show a factual basis for such alleged fear.

*Id.* at 328, 298 S.E.2d at 637. Also, Rule 803 of the North Carolina Rules of Evidence establishes the admissibility of state of mind evidence, reading in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (3) Then Existing Mental, Emotional or Physical Condition — A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . .

N.C.G.S. § 8C-1, Rule 803(3) (1988). Evidence tending to show the state of mind of the victim is admissible as long as the declarant's state of mind is relevant to the case. *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990). *See also State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). In *Cummings* the victim's comments to a paralegal three weeks before she disappeared about her husband's threats to kill her were admitted because the victim's state of mind was relevant to the issue of her relationship with her husband. *Id.* at 313, 389 S.E.2d at 74. Any evidence offered to

shed light upon the crime charged should be admitted by the trial court. *State v. McElrath*, 322 N.C. 1, 13, 366 S.E.2d 442, 449 (1988). Evidence, even if relevant, should not be admitted unless it comports with Rule 403 of the North Carolina Rules of Evidence, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1988).

Ms. Sawyer's testimony on *voir dire* that defendant asked the victim for one hundred dollars and that she refused him provides a plausible reason and factual basis for the victim's fear of defendant. The victim's fear of defendant was relevant to the issue of the relationship between the victim and defendant. At trial defendant testified that the victim had "always been a sweet lady" to him who would lend money to him and hire him for jobs around the house. Ms. Sawyer's testimony tends to show that the victim's state of mind some two weeks before her murder was not that of a "sweet lady" who would lend defendant money but was that of one who was fearful of defendant.

Whether the probative value of relevant evidence is outweighed by its tendency unfairly to prejudice defendant is a question to be decided initially in the trial court's discretion. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986). We find no abuse of discretion in the trial court's determination here that the evidence in question met this test of admissibility. The evidence was relevant, as we have shown, to show a relationship between defendant and the victim which was more favorable to the State and contrary to defendant's version of this relationship, which was more favorable to defendant. The State was clearly entitled to its benefit. It is not the kind of evidence, either, which would have much tendency unfairly to prejudice defendant or to inflame or cause the jury to convict him on an improper basis in light of all the other rather overwhelming evidence tending to show defendant's guilt of the crimes charged. *See State v. DeLeonardo*, 315 N.C. 762, 340 S.E.2d 350 (1986).

III.

[2, 3]  Defendant next contends the trial court erred in permitting Sheriff Norman Newbern to testify over objection and motion to strike about certain statements defendant made to him on 1 May 1986. Defendant also contends that he was impermissibly questioned on his own cross-examination regarding these statements.

The trial court allowed Sheriff Newbern's testimony after conducting a *voir dire* and concluding that admission of the statement would not violate defendant's constitutional rights because it was given freely, voluntarily and understandingly after defendant freely, knowingly, intelligently and voluntarily waived his rights to remain silent and to be represented by counsel.

After this ruling the following colloquy occurred:

Q. Sheriff Newbern, on the early morning of May 2, 1986, what did Zeb Meekins tell you with reference to this incident?

MR. ABBOTT: Objection.

COURT: Overruled.

A. Uh, you want me to start back over?

Q. Yes, if you would, please.

A. Zeb stated . . . that he was jogging after being shut up in the house for two days at Mary Jane Case's, that Roger, Roger Crutch and Junior Mills, which was Lewis J. Mills, came to him in Miss Ethel's [the victim's] car. That Mrs. Ethel Owens was on the passenger side, that Junior was driving. Roger was sitting in the back seat. He stated that he told him, said, "Zeb come here we can trust you since you are wanted for raping a white girl . . ."

MR. ABBOTT: Objection.

COURT: Overruled.

WITNESS NEWBERN: Zeb got in the car; they told him to push the screen back in the house so no one would notice. Then Junior began stabbing Mrs. Ethel Owens. That she screamed, "Please don't kill me. Don't kill me." That he grabbed for his arm to stop him but it was too late. Said he got a scratch on his face below his eye. Zeb stated he knew Mrs. Owens was dead; that she was fifty to eighty miles away. I asked

STATE v. MEEKINS

[326 N.C. 689 (1990)]

Zeb where the body was, that she still could be alive. He stated that she was no way alive and that he was sure that she was dead. And kept stating: "She's dead, man. She's dead." That he would tell us where the body was if we would contact his attorney. An attorney was called and uh . . .

Q. Okay.

MR. ABBOTT: Motion to strike his testimony.

COURT: Motion to strike is denied.

During cross-examination of defendant, the State advised the court out of the hearing of the jury that it would question defendant about his statement to Sheriff Newbern "that Roger and Junior told him: We can trust you since you're wanted for raping a white girl." Defendant, through counsel, then stated, "Your honor, obviously we would object to that information coming in before the jury." The trial judge heard arguments and overruled defendant's objection. The jury returned to the courtroom, and during State's cross-examination of defendant the following colloquy took place:

Q.: Well, do you remember telling the sheriff that Roger and Junior picked you up?

A.: No, I don't.

Q.: While you were out jogging?

A.: No, I don't. No sir.

Q.: You remember that they told you quote: We can trust you since you are wanted for raping a white girl?

A.: Who was that?

Q.: Roger and Junior tell you that?

A.: No, sir.

Q.: Mr. Meekins, isn't it a fact that—in fact, you were in hiding at that time, weren't you?

A.: I wouldn't call it that. Uh, I had knowed Mrs. Powell for 'bout two years and we was dating off and on. And I decided to break up with her and that's when she uh, said that I raped her. Which I didn't.

STATE v. MEEKINS

[326 N.C. 689 (1990)]

Defendant contends that part of his statement to Sheriff Newbern that Rogers said, "Zeb come here we can trust you since you are wanted for raping a white girl" was irrelevant to any material issue in the case, inadmissible as character evidence, and that its probative value was clearly outweighed by its tendency unfairly to prejudice defendant.

Defendant characterizes the contested evidence as tending to show he *committed* another extrinsic crime, *i.e.*, the rape. Actually the evidence shows only that defendant was accused of committing the extrinsic crime, or at least his companions, according to his statement, thought so. Accusations that defendant has committed other extrinsic crimes are generally inadmissible even if evidence that defendant actually committed the crime would have been admissible. *State v. Rankin*, 306 N.C. 712, 295 S.E.2d 416 (1982); *State v. Mack*, 282 N.C. 334, 193 S.E.2d 71 (1972); *State v. Williams*, 279 N.C. 663, 185 S.E.2d 174 (1971).

The first question presented here, then, is whether Sheriff Newbern's testimony that defendant admitted that he saw the victim murdered and her murderers invited him to join in the event because they believed he was wanted for rape and, presumably, would not contact the police, was relevant to some fact or issue in the case. We conclude that it was.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988). All relevant evidence is admissible unless excluded by some other rule of law. N.C.G.S. § 8C-1, Rule 402.

The statement by defendant that the murderers believed he was a fugitive is relevant for several reasons. It explains why Roger Crutch and Junior Mills wanted defendant to join them. It adds credibility both to Sheriff Newbern's testimony that the statement as related by the sheriff was made and to the statement itself. The statement conflicts with defendant's denials at trial that he was involved with the murder of Ethel Owens.

The second question is whether it was error to permit the State to cross-examine the defendant about the pending rape charge. We conclude it was not. The State's cross-examination of defendant about his being wanted on the rape charge was designed to show

defendant's motive for the murder of Ethel Owens and the stealing of her purse and her car. The State was trying to establish defendant's intent to flee from the pending charges and that he committed the murder and robbery in order to obtain the means whereby he could escape. We conclude therefore that it was relevant under Rules 401 and 402.

We must now consider whether the probative value of this evidence regarding the pending rape charge was "substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1988). Whether to exclude evidence under this rule is a matter within the sound discretion of the trial court. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986).

The trial court here did not abuse its discretion in admitting the evidence of which defendant complains. While this is the sort of evidence that inclines juries to decide cases on an improper basis and its admission should be carefully scrutinized by our trial judges, we are confident that here the trial court was well within its discretionary ambit in ruling the evidence admissible.

As we have shown, the evidence of defendant's incriminating pretrial statement was relevant and valuable to the State on the question of whether defendant made the statement attributed to him by Sheriff Newbern and whether the statement was true. Cross-examination of defendant about these charges was designed to show a possible motive for the commission of the crimes charged— an important fact for the State to establish in any criminal case. Other evidence of defendant's guilt was fairly overwhelming, and there is little chance the jury would have improperly seized on only this evidence as a basis for conviction.

Regarding cross-examination of defendant on questions relating to his being wanted for rape, this case differs from *State v. Williams*, 279 N.C. 663, 185 S.E.2d 174. There, we held that a witness's credibility may not be impeached by cross-examination as to whether he had been accused, however formally, of an unrelated crime. The theory underlying *Williams* is that a mere unproven accusation that a witness has committed a crime is not sufficiently probative of the witness's credibility to justify its admission even if, as when *Williams* was decided, the actual commission or conviction of the crime would have been a proper subject of cross-examination.

Unlike *Williams*, the State here did not cross-examine defendant about the rape accusation to show he was unworthy of belief because of this alleged bad act. Rather, the prosecutor inquired about this for the purpose of establishing defendant's motive for the crime for which he was on trial.

Accordingly, we overrule all defendant's assignments of error and conclude that he received a fair trial free from reversible error.

No error.