STATE OF NORTH CAROLINA v. JOHNNY BRADLEY GLENN

No. 60A92

(Filed 12 February 1993)

1. **Jury § 257 (NCI4th)— peremptory challenge—racial basis— prima facie case not shown**

    A defendant on trial for two first degree murders failed to establish a prima facie case that the prosecutor peremptorily challenged a prospective juror solely on the basis of race where defendant and both victims are black; the record does not reflect that the prosecutor peremptorily challenged any other black venire person; and the prosecutor stated that he peremptorily challenged this prospective juror because his statement that he "would let [the death penalty] be the last alternative" was indicative of greater equivocation toward the death penalty than had been expressed by other jurors.

    **Am Jur 2d, Jury § 173.**

    **Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

2. **Appeal and Error § 150 (NCI4th)— challenge to evidence on appeal—failure to object at trial**

    Where defendant did not object at trial to the admission of a 911 tape recording on the basis of a "suggestive" identifica-

STATE v. GLENN

[333 N.C. 296 (1993)]

tion procedure, he will not be allowed to challenge the admission of the recording on that ground for the first time on appeal.

**Am Jur 2d, Appeal and Error § 602.**

**Admissibility of tape recording or transcript of "911" emergency telephone call. 3 ALR5th 784.**

3. **Evidence and Witnesses § 959 (NCI4th) — hearsay rule — state of mind exception — victim's fear of defendant**

Testimony by a witness that a murder victim told him that she wanted to move in with him because defendant had attacked her, pinned her to the bed, and attempted to stab her was admissible under the state of mind exception to the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 803(3) to show the victim's fear of defendant where similar testimony by the witness on voir dire provided a plausible reason and factual basis for the victim's fear of defendant, and the victim's fear of defendant was relevant to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder. Furthermore, the trial court did not abuse its discretion in its determination that the probative value of this evidence outweighed its tendency to unfairly prejudice defendant since the evidence was highly relevant to show motive or intent as well as to show the status of the victim's relationship with defendant prior to her death.

**Am Jur 2d, Evidence § 650.**

4. **Appeal and Error § 439 (NCI4th) — transcript of testimony — assignments of error — exclusion of questions — failure to comply with Rules of Appellate Procedure**

Defendant's assignments of error to the trial court's exclusion of testimony by certain witnesses were dismissed for failure to comply with Appellate Procedure Rule 28(d) where the transcript of the proceedings was filed pursuant to Rule 9(c)(2), and defendant has not identified the specific questions or answers which he wants the appellate court to review, has not included the portions of the transcript containing those questions or answers in the appendix, and has not included a verbatim recitation of those questions or answers in his brief.

**Am Jur 2d, Appeal and Error § 658.**

Justice WEBB concurring in the result.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing two consecutive life sentences entered by Ferrell, J., at the 19 August 1991 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 14 January 1993.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Special Deputy Attorney General, for the State.*

*Isabel Scott Day, Public Defender, by Grady Jessup, Assistant Public Defender, for defendant-appellant.*

MEYER, Justice.

Defendant was indicted by a Mecklenburg County grand jury on 11 March 1991 for the murders of Johnnie Sampson and Subrina Osborne. Defendant was tried capitally in Superior Court, Mecklenburg County, in August 1991, and the jury returned verdicts finding defendant guilty of the first-degree murders of Sampson and Osborne. Following a sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended sentences of life imprisonment for both convictions of first-degree murder. In accordance with the jury's recommendation, Judge Ferrell sentenced defendant to two life sentences for the murders. Defendant appeals to this Court as of right.

Evidence presented at defendant's trial shows the following. On 1 December 1990, the two victims, defendant, and Forist Foster lived in Sampson's residence at 1932 Umstead Street in Charlotte, North Carolina. Osborne and defendant were dating and shared a bedroom. In the afternoon prior to the murders, Foster and Sampson were sitting in the house watching football. Osborne ran into the house and asked Sampson if she could hide in his bedroom because she "was scared of [defendant] . . . [b]ecause he had been drinking." Osborne then went into Sampson's bedroom and hid. Some time later, defendant ran into the house and went into his and Osborne's bedroom. After rummaging around in the room, defendant returned to the living room and started talking to Sampson. Defendant then started hitting Sampson. Foster asked defendant to leave, and when defendant ignored him, Foster went to call the police. Foster ran to the Villa Heights Store and found that he could not use the phone there. Foster then ran to Louis Cunningham's house and told Cunningham that defendant was

"beatin' [the victim Sampson] up." Foster asked Cunningham to walk back down to Sampson's with him. Upon arriving at Sampson's house, Foster found the front door ajar. When Foster and Cunningham went into the house, they saw Sampson lying on the floor, with blood all over his face. They then walked down the hallway and found Osborne, with blood all over her, lying in the hallway. Foster then went to John Kirby's Mart and called the police.

That evening at approximately 6:22 p.m., Charlotte Police Officer David Schwob went to 1932 Umstead Street in response to a dispatcher's call. As Officer Schwob approached the front door, he saw a male figure, later identified as Johnnie Sampson, lying on the floor in the living room. Upon opening the storm door, Schwob noticed drops of blood on the floor just inside the doorway and a large amount of blood underneath Sampson's body. Schwob then looked down a hallway and observed a female victim, later identified as Subrina Osborne, lying on her back. The female victim's face, neck, and chest area were covered with blood. Schwob subsequently advised his supervisor that he had located two deceased subjects and requested crime scene search technicians and a homicide investigator.

On 2 December 1990 at approximately 11:00 a.m., Officer G.L. Robbins with the Charlotte Police Department was dispatched to Number 11, 1530 Hawthorne Lane. Defendant, or someone on his behalf, had called the police department and requested that an officer come down and carry defendant to the Law Enforcement Center to talk to an investigator. Upon Robbins' arrival at the apartment, he was met by defendant and his three sisters. Robbins told defendant and his sisters that defendant was not under arrest. Officers Brandon and Hobson arrived at 1530 Hawthorne Lane approximately five minutes after Robbins. Brandon and Hobson had a conversation with defendant's sisters as defendant and Robbins were leaving en route to the Law Enforcement Center. Pursuant to the conversation, one of defendant's sisters gave Hobson a grocery bag containing personal property of the defendant. Hobson turned the bag over to Robbins, who was already in his police car with defendant in the back seat.

Robbins transported defendant to the Law Enforcement Center along with the bag of defendant's personal effects. At the Law Enforcement Center, Robbins introduced defendant to Investigator L.D. Walker. After Walker seated defendant in an interview room,

he then walked back out to talk with Robbins. While Robbins was explaining that the bag belonged to defendant, Robbins looked down into the bag, which was partially open, and saw a spot of blood on a boot inside the bag. Robbins told Walker about the spot of blood on the boot. Robbins then gave the bag to Brandon, who turned the bag of clothes in to the Property Control Room.

Walker went back into the interview room, where he began questioning defendant at approximately 12:00 p.m. Defendant initially told Walker that he did not commit the offenses but that he might know who did. Walker then advised defendant that since one of the victims was defendant's girlfriend, this may indicate he was a suspect. At this point, Walker advised defendant of his *Miranda* rights, and defendant then signed a waiver of rights form. Walker then told defendant that he was considered a suspect in the case, but defendant denied any involvement in the murders. Walker asked defendant about the blood on defendant's boot that was in the bag of clothes. Initially, defendant told Walker that around midnight, he had walked into the house after the murders had been committed and that was how he had gotten blood on his shoes. Walker told him that this was impossible based on the fact that the police had already roped off the area. Walker then asked defendant why he killed the two victims. At this point, "tears came into [defendant's] eyes, and he stated, 'I did it because I caught them f---ing in bed.'" Defendant then gave a statement to Walker which Walker reduced to writing and had defendant sign.

In his confession, defendant stated that on 1 December 1990, he and Osborne rented a room from Sampson. After defendant sat around drinking with Sampson, Foster, and Osborne, he left the house to go walking around. When he arrived back at the house, he did not see anyone. He walked down to Sampson's room and "looked into the bedroom and saw [Sampson] and [Osborne] f---ing in the bed." Defendant stated that he "totally flipped out" and "went into a fit of rage." At this point, he said that he grabbed a steak knife from his back pocket and stabbed Osborne in the back. Defendant said he then went after Sampson. Defendant stabbed Sampson "several times," and he stated that he thought he left the knife in Sampson. Defendant then went to the kitchen to get another knife. He found a butter knife and then went and stabbed Sampson some more. Defendant stated that as he was walking down the hallway, Osborne grabbed his legs. He "turned and kicked her and then . . . stomped her with [his] foot." Defendant confessed

that he was not sure how many times he stabbed the victims but that he meant "to kill them."

Investigator R.A. Holl arrived at the Law Enforcement Center at 1:00 p.m. on 2 December 1990. Officers Brandon and Robbins were outside the interview room in which defendant was located. Walker exited the room and told Holl about defendant's confession. Upon entering the interview room, Holl questioned defendant, and defendant related to Holl substantially the same statement he had given to Walker. Holl then went to the magistrate's office to obtain arrest warrants.

Dr. James M. Sullivan, medical examiner for Mecklenburg County, testified as an expert in forensic pathology. Dr. Sullivan performed autopsies on both Osborne and Sampson. He testified that Osborne had multiple external wounds about her head, face, and neck. Specifically, Sullivan found seventeen cutting wounds to the area of the head, nine of which were cutting wounds to the neck. The injuries to Osborne's chest were six stab wounds and several superficial cutting wounds. Sullivan opined that any one of the three stab wounds to the heart could have been potentially lethal wounds. Sullivan testified that Sampson suffered multiple cutting wounds to the face, blunt trauma injuries, and a black eye. Sampson also had twenty-one stab wounds on his buttocks and upper leg area and two stab wounds to the neck. Sullivan opined that the two stab wounds to the neck were the most significant wounds contributing to the cause of death. In Sullivan's opinion, all the wounds inflicted on both victims were premortem wounds, meaning they were inflicted prior to death.

Additional facts will be set forth as necessary with respect to the various issues.

[1] As defendant's first assignment of error, he contends that he is entitled to a new trial because the prosecutor violated his state and federal constitutional rights by peremptorily challenging a prospective juror solely on the basis of race. Article I, Section 26 of the Constitution of North Carolina prohibits peremptory challenges based solely on the race of the prospective juror. *State v. Smith*, 328 N.C. 99, 119, 400 S.E.2d 712, 723 (1991). The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution also prohibits such discrimination. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). In *Batson*, the Supreme Court of the United States admonished that "the Equal Protection

STATE v. GLENN

[333 N.C. 296 (1993)]

Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 90 L. Ed. 2d at 83.

In *Batson*, the Supreme Court established a three-part test for determining whether a defendant has established a prima facie case of purposeful discrimination:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v Georgia*, 345 US [559], 562, 97 L Ed 1244, [1247-48], 73 S Ct 891 [(1952)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 96, 90 L. Ed. 2d at 87-88 (citation omitted). The initial burden is on the defendant who alleges such racial discrimination to make a prima facie showing that the prosecutor used peremptory challenges to exclude jurors because of their race. *State v. Thomas*, 329 N.C. 423, 430, 407 S.E.2d 141, 146 (1991). In *Hernandez v. New York*, --- U.S. ---, ---, 114 L. Ed. 2d 395, 405 (1991), the United States Supreme Court held that where the prosecutor offers racially neutral explanations for his peremptory challenges and the trial court finds them to be true and not pretextual, the issue of the prima facie case is moot.

In this case, defendant and both victims are black. The record shows that at the time the prosecutor sought to remove prospective juror Brown, he had used four peremptory challenges to remove three otherwise qualified white jurors. Therefore, before challenging juror Brown, the prosecution had not used a peremptory challenge against a black venire person. In fact, defendant does not argue, and the record does not reflect, that the prosecution peremptorily challenged any black venire person other than juror Brown. Defense counsel objected to the excusal of juror Brown, referring to *Batson v. Kentucky*. The trial court asked the prosecutor if he wanted

STATE v. GLENN

[333 N.C. 296 (1993)]

to place the reasons for his challenge on the record. The prosecutor stated that Brown's statement, during his examination of Brown, that he "would let [the death penalty] be the last alternative" was indicative of greater equivocation toward the death penalty than had been expressed by other jurors. This reason is " 'clear and reasonably specific' and 'related to the particular case to be tried.' " *Thomas*, 329 N.C. at 431, 407 S.E.2d at 147 (quoting *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990)).

Defendant has failed to establish a prima facie case that the State was acting out of any racial bias or any desire to exclude black persons from the jury on the basis of race. Defendant has not met the *Batson* test, and this assignment of error is overruled.

[2] Defendant next contends that the trial court erred by denying his motion in limine and admitting into evidence a 911 tape recording on the grounds that the recording was not properly authenticated in that the identification procedure was impermissibly suggestive. On 2 December 1990 at 1:57 a.m., Officer Wayne Watkins received a call on the 911 line at the Charlotte Police Department. During his conversation with Watkins, the caller stated, "I killed two people on Umstead." State's witness Johnny Glenn, Jr., defendant's son, met Investigator Holl in the office of Glenn's former employer to listen to the tape recording. The witness, Johnny Glenn, Jr., identified the voice on the tape as that of his father.

Defendant asserts that at the time Glenn listened to the recording, he not only knew that his father was in custody charged with murder, but also felt that his father had confessed to the two murders. Based upon the totality of the circumstances, defendant argues that the identification procedure was impermissibly suggestive.

Prior to the State's efforts to place this recording in evidence, defendant filed a motion in limine to exclude the tape recording on the grounds of authenticity. Following a voir dire hearing, the trial court made certain findings of fact and denied defendant's motion to exclude the recording.

Our examination of the record discloses that defendant did not object to the admission of the recording on the basis of a "suggestive" identification procedure so as to place this contention at issue before the trial judge at the voir dire hearing. Rather, the gravamen of defendant's motion was the chain of custody of

the 911 tape and the reliability of State's witness, Johnny Glenn, Jr. Having failed to challenge at trial the admission of the 911 tape on the ground that the identification procedure was impermissibly suggestive, the defendant will not be allowed to do so for the first time on his appeal to this Court. *State v. McPhail*, 329 N.C. 636, 641, 406 S.E.2d 591, 595 (1991); N.C. R. App. P. 10(b)(1). We specifically reject defendant's assignment of error for this reason.

[3] Defendant further contends that the trial court erroneously allowed into evidence the hearsay testimony of Otis Lewis. We find no merit in this assignment of error.

On the afternoon of 26 November 1990 (five days prior to the murders), one of the victims, Subrina Osborne, talked to Otis Lewis. Osborne told Lewis that she wanted to move in with him "because [defendant] was trying to kill her the night before." Osborne stated that the defendant "had pinned her down to the bed with a knife and tried to stab her in the throat with the knife." Osborne further told Lewis that she did not want to go back to the house on Umstead Street. After pretrial motions and objections at trial, Lewis was permitted to testify to this conversation. The trial court instructed the jury that the testimony was "admissible only for the purpose of proving motive, intent or identification of the defendant, or fear of the defendant by Sabrina [sic] Osborne." Defendant contends that admission of this testimony under N.C.G.S. § 8C-1, Rule 803(3) was reversible error because the State failed to demonstrate a factual basis or plausible reason for any alleged fear by the victim.

Rule 803 of the North Carolina Rules of Evidence establishes the admissibility of state of mind evidence. Rule 803 reads, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . .

STATE v. GLENN

[333 N.C. 296 (1993)]

N.C.G.S. § 8C-1, Rule 803(3) (1992). "Evidence tending to show the state of mind of the victim is admissible as long as the declarant's state of mind is relevant to the case." *State v. Meekins*, 326 N.C. 689, 695, 392 S.E.2d 346, 349 (1990); *see also State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990); *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). In *Meekins*, this Court held that the trial court did not err in admitting the testimony of the victim's niece that the victim told her "that she was afraid of [the defendant]" and that the victim had previously said several times that she was fearful of defendant. *Meekins*, 326 N.C. at 694-95, 392 S.E.2d at 349. We held in *Meekins* that the niece's testimony on voir dire that the victim told her two weeks before her murder that she feared defendant because defendant had asked for one hundred dollars and she had refused to give it to him provided a plausible reason and factual basis for the victim's fear of defendant. *Id.* at 696, 392 S.E.2d at 349.

Here, Lewis' testimony on voir dire that Osborne told him that defendant attempted to kill her and that Osborne wanted to move in with Lewis provides a plausible reason and factual basis for the victim's fear of defendant. The victim's fear of defendant was relevant to show the nature of the victim's relationship with defendant and the impact of defendant's behavior on the victim's state of mind prior to the murder. At trial, Lewis testified that the victim told him that defendant tried to kill her five days before the murder. The victim's statement to Lewis that defendant had attacked her, pinned her to the bed, and attempted to stab her in the throat with a knife provided the factual basis for the victim's fear of the defendant and her desire to move in with Lewis. Therefore, the admission of Lewis' testimony was consistent with the limits that this Court imposed on such testimony in *State v. Alston*, 307 N.C. 321, 328, 298 S.E.2d 631, 637 (1983).

Initially, it is within the trial court's discretion to determine whether the probative value of relevant evidence is outweighed by its tendency to unfairly prejudice defendant. *Meekins*, 326 N.C. at 696, 392 S.E.2d at 350. We do not find that the trial court abused its discretion in its determination that the evidence in question met this test. The evidence was highly relevant to show the status of the victim's relationship with the defendant prior to the victim's death, as well as being relevant to the issues of motive or intent. We find that the trial court did not abuse its discretion

when it permitted Lewis to testify about the conversation that he had with the victim.

[4] In defendant's final arguments, he contends that (1) the trial court erred when it sustained objections to defendant's questions of witnesses during the voir dire hearing conducted to determine the admissibility of a tape recording of the defendant's voice, (2) the trial court erred when it sustained objections to certain questions of defense counsel on cross-examination, (3) the trial court erred when it sustained the State's objection to defense counsel's questions to a psychologist regarding defendant's ability to think and plan, and (4) the prosecutor made highly improper and prejudicial remarks in his closing argument. These assignments of error are deemed waived for failure to comply with Rule 28(d) of the Rules of Appellate Procedure.

Rule 28(d)(1) of the Rules of Appellate Procedure provides that when the transcript of proceedings is filed pursuant to Rule 9(c)(2), a party must either reproduce as an appendix to its brief "those portions of the transcript of proceedings which must be reproduced verbatim in order to understand any question presented in the brief" or "those portions of the transcript showing the pertinent questions and answers when a question presented in the brief involves the admission or exclusion of evidence." N.C. R. App. P. 28(d)(1)(a), (d)(1)(b). Under Rule 28(d)(2)(a), appendixes to defendant's brief are not required "whenever the portion of the transcript necessary to understand a question presented in the brief is reproduced verbatim in the body of the brief." N.C. R. App. P. 28(d)(2)(a). In *State v. Edmonds*, 308 N.C. 362, 302 S.E.2d 223 (1983), this Court held that if a defendant's brief did not contain portions of the transcript sufficient to understand the question presented, then the defendant's appeal on that question was subject to dismissal under Rule 28(b)(4), the predecessor to Rule 28(d).

Contrary to Rule 28(d) of the Rules of Appellate Procedure, defendant in the case *sub judice* has not identified the specific questions or answers which he wants this Court to review, has not included the portions of the transcripts containing those questions or answers in the appendix, and has not included a verbatim recitation of those questions or answers in his brief. Therefore, in accordance with *State v. Edmonds*, 308 N.C. 362, 302 S.E.2d 233, these assignments of error are dismissed.

**HASSETT v. DIXIE FURNITURE CO.**

[333 N.C. 307 (1993)]

We have carefully reviewed each of the defendant's exceptions and assignments of error and find that his trial was free of prejudicial error.

NO ERROR.

Justice WEBB concurring in the result.

I concur in the result reached by the majority although I believe the testimony by Otis Lewis as to what Subrina Osborne told him before she died was inadmissible hearsay testimony. It is true, as the majority says, that N.C.G.S. § 8C-1, Rule 803(3) allows, as an exception to the hearsay rule, testimony as to what an extrajudicial declarant says in order to prove the declarant's state of mind. The state of mind of the declarant must be relevant to some issue in the case, however, to be admissible. *State v. Meekins*, 326 N.C. 689, 392 S.E.2d 346 (1990). I do not believe Subrina Osborne's state of mind was relevant to the matters that had to be proved to convict the defendant.

The evidence against the defendant was so strong that I do not believe what I perceive to be error in the admission of testimony demonstrates there is a reasonable possibility that had the error not been made there would have been a different result. I would hold that this was harmless error. N.C.G.S. § 15A-1443 (1988).