**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 04-1**

———————

JOHNNY RAY DAUGHTRY,

Petitioner - Appellant,

versus

MARVIN POLK, Warden, Central Prison, Raleigh,
North Carolina,

Respondent - Appellee.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   James C. Fox, Senior
District Judge.  (CA-98-787-5-F-HC)

———————

Argued:  May 17, 2006                    Decided:  July 17, 2006

———————

Before WILKINS, Chief Judge, SHEDD, Circuit Judge, and HAMILTON,
Senior Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Andrew O. Whiteman, HARTZELL & WHITEMAN, L.L.P., Raleigh,
North Carolina, for Appellant.   Alvin William Keller, Jr.,
Assistant Attorney General, Leonard Michael Dodd, Special Deputy
Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellee.  **ON BRIEF:** Seth A. Blum, KURTZ &
BLUM, P.L.L.C., Raleigh, North Carolina, for Appellant.   Roy
Cooper, Attorney General of North Carolina, Barry S. McNeill,
Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF
JUSTICE, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

In September 1993, Johnny Ray Daughtry was convicted in Johnston County, North Carolina Superior Court of, inter alia, first-degree murder. Following a sentencing hearing, the jury recommended a sentence of death for the murder conviction and, in accordance with the jury's verdict, the state trial court sentenced Daughtry to death for that conviction. After exhausting his state remedies, Daughtry filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina, 28 U.S.C. § 2254, which the district court dismissed.[1] On December 27, 2005, we granted Daughtry a certificate of appealability, id. § 2253. For the reasons stated below, we affirm the district court's dismissal of Daughtry's habeas petition.

I

As found by the North Carolina Supreme Court on direct appeal, the facts of this case are as follows:

> The State's evidence tended to show that the victim was killed on 9 April 1992. At that time she was living with her boyfriend, Michael Hopkins, in his Smithfield apartment. Hopkins testified that he last saw the victim alive at about 4:00 p.m., just before he went to bed. When he awoke around 7:30 p.m., he discovered the victim's body lying in a pool of blood near the front

---

[1]Initially, Daughtry named James French, former Warden of the Central Prison in Raleigh, North Carolina as respondent. Now, Marvin Polk holds this position and has been substituted as respondent, see Fed. R. Civ. P. 25(d)(1). For ease of reference, we will refer to respondent as "the State" throughout this opinion.

steps outside his apartment. Hopkins ran to his landlady's house and called the police; he waited at the end of the driveway until the officers arrived.

The Smithfield Police Department received a call at 7:38 p.m., and officers arrived at Hopkins' apartment a few minutes later. They found the victim's naked body face down next to the apartment steps. Her head lay in a pool of blood, and a stick protruded from her rectum. Her left arm extended along the left side of her body, palm up; her right index finger was in her mouth. SBI Special Agent David McDougall examined the scene. He found several articles of the victim's clothing on the ground near the body and a three-inch-thick log containing blood and strands of hair atop a woodpile not far away. He saw no signs of a struggle or other violence inside the apartment.

Dr. Karen Chancellor, a forensic pathologist who performed the autopsy, testified that she found multiple bruises and abrasions on the victim's head, face, and neck. The lower jawbone was fractured in two places, and the back of the scalp had four separate lacerations, each exposing bone. She also found multiple skull fractures, hemorrhaging around the brain and brain stem, and bruises of the brain tissue. Chancellor testified that both internal and external lacerations existed in and around the vagina and rectum. Further, the injuries around the rectal area were consistent with an object being rotated in the rectum. She opined that death resulted from blunt-force trauma to the head, the victim had been hit at least five times, and the log McDougall found could have been used to inflict the injuries.

SBI Special Agent Scott Worsham testified that hair taken from the log was consistent with the victim's. He removed the stick from the victim's rectum under McDougall's supervision. The stick had been embedded about six and one-half inches into the rectum and inserted at such an angle that it could have penetrated some other part of the body, such as the vaginal area.

SBI Special Agent Mark T. Boodee, an expert in forensic serology, testified about the results of DNA testing, which revealed that blood samples taken from the pants defendant wore on the night of the murder contained DNA material that matched the victim's. SBI Special Agent Peter Duane Deaver, another expert forensic serologist,

testified that blood found on the log and on defendant's pants was the same type as the victim's blood but not the same as defendant's.

Defendant testified that he and the victim had lived together for about three and one-half years; they broke up in March 1992. On the day of the murder he left work around 3:00 p.m., drank some beer on the way home, and also drank a few beers at a local tavern. He arrived at his grandmother's house, where he was living, between 5:30 and 6:00 p.m. He then went to Mike Hopkins' home at about 6:30. He and the victim sat on the steps outside the apartment talking for a while. The next thing he remembered was being two or three blocks away from Hopkins' apartment, walking in an agitated state. He noticed a little blood on his hand. He then met some friends and drank with them from 8:30 until about 11:00 p.m. He did not get drunk.

Two psychiatric experts testified for defendant. Dr. Robert Rollins testified that defendant had average intelligence and no major disturbance of mood or thinking. Defendant was distrustful, expected people to mistreat him, and lacked concern about other people. Rollins diagnosed defendant with alcohol abuse and dependence as well as adjustment disorder, which included depression. Dr. Billy Royal diagnosed defendant with depression, alcohol and marijuana abuse, and personality disorder. He considered the disorder to include immaturity, impulsivity, and dependence in the relationship with the victim. Both doctors opined that defendant's ability to form a specific intent to kill and to premeditate and deliberate was impaired on 9 April 1992. Both also noted defendant's history of violence toward the victim.

At sentencing the State relied on its guilt phase evidence and also introduced an eight-by-ten-inch photograph that depicted the stick protruding from the victim's rectum. This photograph had been excluded from the guilt phase.

Defendant's sister testified at sentencing that defendant supported the victim as best he could and always helped his two deaf brothers. She also stated that their father, who was not at home much due to his work, hit defendant and assaulted their mother. Further, defendant used various drugs, including marijuana and cocaine.

> Psychiatric testimony offered at sentencing showed that
> defendant grew up in a dysfunctional family environment
> that included abuse of his mother and severe punishment
> of defendant for his transgressions. He became dependent
> upon alcohol early in his teenage years; this dependence
> exacerbated the difficulty he experienced in dealing with
> the end of his relationship with the victim. According
> to the expert testimony, defendant suffered from
> depression, substance dependence, and personality
> disorder at the time of trial.

State v. Daughtry, 459 S.E.2d 747, 752-54 (N.C. 1995).

On May 11, 1992, Daughtry was indicted by a state grand jury sitting in Johnston County, North Carolina on charges of first-degree murder and first-degree sexual offense. On September 30, 1993, a jury convicted Daughtry of both offenses. The murder conviction rested on both premeditation and the felony murder rule, with the underlying felony being the first-degree sexual offense.

At the sentencing phase of the bifurcated proceeding, the State submitted, and the jury found the existence of, two aggravating circumstances: (1) the capital felony was committed while Daughtry was engaged in a sexual offense; and (2) the capital felony was especially heinous, atrocious, or cruel. The jury found one statutory mitigating circumstance (the capital felony was committed while Daughtry was under the influence of mental or emotional disturbance) and fourteen of the nineteen nonstatutory mitigating circumstances submitted. After finding that the aggravating circumstances outweighed the mitigating circumstances, the jury unanimously recommended a sentence of death, which the state trial court accordingly imposed.

On direct appeal, the Supreme Court of North Carolina affirmed, finding no error in either phase of Daughtry's trial. See id. at 754-70. On January 16, 1996, the United States Supreme Court denied Daughtry's petition for a writ of certiorari. See Daughtry v. North Carolina, 516 U.S. 1079 (1996).

On April 29, 1996, the Superior Court for Johnston County set an execution date for Daughtry. The court also appointed two attorneys to assist Daughtry in the preparation of a motion for appropriate relief (MAR). On June 24, 1996, Daughtry moved for a stay of execution, which was denied. Daughtry appealed the denial of his motion for stay of execution to the North Carolina Supreme Court. The North Carolina Supreme Court granted relief in the form of allowing Daughtry time to prepare and file a MAR on or before October 28, 1996.

On August 19, 1996, Daughtry filed a pro se "Motion to Cancel Appeal," wherein he requested that his stay of execution be lifted and his sentence of death carried out. Upon inquiry by the Superior Court of Johnston County, Daughtry, through counsel, indicated that he did not wish to withdraw his motion to withdraw his appeal. The court then ordered that Daughtry be evaluated to determine his competency to decide to forego his post-conviction remedies and proceed to execution.

On October 21, 1996, a hearing was held in Johnston County Superior Court to determine Daughtry's competency. At the outset

of the hearing, the court asked Daughtry if he wished to continue with his "Motion to Cancel Appeal," but Daughtry declined to answer the question. The court then asked Daughtry if he wished to have his post-conviction counsel represent him and Daughtry indicated that he did so wish. Among the evidence submitted at the hearing was the mental health evaluation of Dr. Robert Rollins, a forensic psychiatrist, and a "record of contact" between Daughtry and Dr. M.F. Baloch, Daughtry's treating psychiatrist.

The record of contact indicated that, on August 7, 1996, Dr. Baloch found that Daughtry: (1) "denied any symptoms"; (2) was "clinically stable"; (3) "denied auditory and visual hallucinations"; (4) denied "suicidal or homicidal ideations"; (5) denied depression; and (5) had a stable mood.

According to Dr. Rollins' evaluation, he met Daughtry on two occasions, once on September 24, 1996 and again on October 8, 1996. Dr. Rollins noted that Daughtry's speech was "clear" and that his thinking was "organized." He also noted that Daughtry's perception, concentration, orientation, memory, and intellectual functions were "intact." During the interviews, Daughtry stated a desire to withdraw his appeal and proceed to execution to "escape the stress of his present situation." Daughtry complained that "voices" were "driving [him] to do this." According to Dr. Rollins, these auditory hallucinations were affecting Daughtry's judgment. Ultimately, Dr. Rollins diagnosed Daughtry as having

major depression with psychotic features, although he could not rule out other possible diagnoses, including malingering. Based on the available information before him, Dr. Rollins concluded that Daughtry had a mental disorder which impaired his ability to make reasoned and rational judgments. According to Dr. Rollins, Daughtry understood "his position with regard to the law and the nature and object of the proceedings against him." However, Dr. Rollins indicated that Daughtry's "ability to cooperate with his attorneys and conduct a defense in a rational manner" was impaired. Consequently, Dr. Rollins concluded that Daughtry was not competent to make the decision to withdraw his appeals, although he did add that Daughtry was "competent to [be executed] in that he understands that transaction." Dr. Rollins further concluded that, if Daughtry "were less depressed, he likely would not wish to withdraw his appeals and overall would be more comfortable."

Following the October 21 hearing, the Johnston County Superior Court entered an order on October 24, 1996 finding that: (1) Daughtry's "decision to remain mute was a decision made" by Daughtry and was not the result of any mental impairment; (2) Daughtry's "conduct, considered in light of all of the evidence, appears to be a dilatory tactic to delay post conviction remedies allowed by law"; and (3) Daughtry was "willfully" refusing to assist his attorneys even though he is in fact able "to assist his attorneys to the extent necessary in pursuing post-conviction

remedies." In light of these findings, the court held that Daughtry's "Motion to Cancel Appeal" was "null and void" because Daughtry refused to answer the court's question concerning his desire to abandon post-conviction remedies and proceed with execution. The court also held that Daughtry was competent to assist his attorneys.[2]

On October 28, 1996, Daughtry filed his MAR, asserting a claim under Brady v. Maryland, 373 U.S. 83 (1963), and twenty-three claims of ineffective assistance of counsel. While his MAR was pending, Daughtry filed a motion "Questioning the Capacity of the Defendant." The motion asserted, inter alia, that Daughtry was unable to assist post-conviction counsel. On June 30, 1997, a hearing was held in Johnston County Superior Court concerning Daughtry's competency to assist counsel. At the hearing, Daughtry proffered the expert testimony of a psychiatrist, Dr. James Bellard.

Dr. Bellard testified that Daughtry was suffering from major depression with psychotic features, the same diagnosis offered by Dr. Rollins at the October 21, 1996 competency hearing. According to Dr. Bellard, Daughtry was able to understand the nature and the object of the proceedings against him and was aware of his

---

[2]Daughtry appealed the Johnston County Superior Court's October 1996 competency determination to the Supreme Court of North Carolina, which denied Daughtry's petition for a writ of certiorari on February 7, 1997. See State v. Daughtry, 483 S.E.2d 181 (N.C. 1997).

surroundings, the reason he was in prison, and the reason he was sentenced to death. Dr. Bellard also found Daughtry's memory to be intact and that Daughtry had low to normal intelligence.

Dr. Bellard also testified as to Daughtry's ability to consult with counsel. Dr. Bellard testified that Daughtry was unable to assist his defense in a rational or reasonable manner because of his ambivalence about going forward with his appeals or ending them and being executed. According to Dr. Bellard, Daughtry's ambivalence was "complicated" by his depression and auditory hallucinations. Dr. Bellard testified that Daughtry "hasn't demonstrated an ability to be consistent about what is before him and how to work with attorneys." Dr. Bellard added that Daughtry "is unclear about what he wishes to do, and I believe, is unclear about the role he may or may not play in all this." Although Dr. Bellard testified that alleged auditory hallucinations were one reason Daughtry wanted to end his appeals, Daughtry also gave him clear and rational reasons to end his appeals apart from any voices; for example, Daughtry indicated that he wanted to end his appeals because: (1) "he didn't see any sense in" appealing; (2) "he wanted an end to the waiting"; and (3) the appeals were "taking a toll on his family." Dr. Bellard indicated that being ambivalent about a decision which would end one's life was normal. Like Dr. Rollins, Dr. Bellard was unable to determine whether Daughtry was truthful about the voices he heard. The state court asked if a

motive for Daughtry's malingering could be to forestall the death penalty, to which Dr. Bellard answered in the affirmative.

At the June 30, 1997 hearing, the State introduced the testimony of Sally Gainey, the victim's mother. She testified that she had known Daughtry for ten years. While he was dating the victim, Daughtry lived in Gainey's home. Gainey had loved Daughtry much like she would one of her own children. As a result of a letter from Daughtry, Gainey visited Daughtry at Central Prison in February 1997. During her conversation with Daughtry, Gainey detected no difference in Daughtry's demeanor from the Daughtry she had always known. Daughtry also told Gainey that he was not going to help his counsel with his post-conviction proceeding.

On July 1, 1997, based upon the evidence and the testimony proffered at the June 30 hearing, the Johnston County Superior Court found that Daughtry's "depression and extreme ambivalence" towards being executed did not render him unable to assist his post-conviction counsel. The court also found that Daughtry was making a deliberate choice not to cooperate with his counsel. The court found that Daughtry was able to both "understand the nature and object of the proceedings against him" and "comprehend his own situation in reference to the proceedings." As a result of the evidence before it, the court concluded that there was no justifiable reason for the court to reconsider or vacate its October 24, 1996 order finding Daughtry competent to proceed.

Free to decide the MAR on the merits, the state habeas court denied Daughtry's MAR. On July 8, 1998, the Supreme Court of North Carolina denied Daughtry's petition for a writ of certiorari. See State v. Daughtry, 510 S.E.2d 660 (N.C. 1998).

On October 13, 1998, Daughtry filed his federal habeas petition in the United States District Court for the Eastern District of North Carolina. On August 27, 2003, the district court held that Daughtry was not entitled to federal habeas corpus relief and dismissed the petition. Thereafter, Daughtry filed a timely notice of appeal.

While his appeal in this court was pending, a "Petition for Adjudication of Incompetence and Application for Appointment of Guardian" was filed in Wake County Superior Court by one of Daughtry's counsel. In the petition, Daughtry's counsel sought to have Daughtry declared incompetent based on, among other things, Daughtry's refusal to meet with and communicate with his counsel. Daughtry's counsel also indicated that, in a letter authored by Daughtry in November 2003, Daughtry stated a desire to "cancel all appeals."

As a result of Daughtry's stated desire to withdraw his appeal to this court, on March 25, 2004, the State filed in this court a motion for remand. In its motion, the State argued that Daughtry's appeal should be remanded to the district court for a hearing on and determination of Daughtry's desire to pursue his appeal to this

court.  On April 21, 2004, we granted the State's motion and remanded the case to the district court for the limited purpose of making factual findings concerning whether Daughtry desired to appeal the denial of his federal habeas petition and any related competency questions.

In preparation for the proceeding before the district court, the State had Dr. Robert Brown, a forensic psychiatrist, evaluate Daughtry.  In his evaluation, Dr. Brown noted that Daughtry's "speech was clear and well articulated."  He also noted that Daughtry's thoughts were "logical and linear."  He noted that Daughtry's "concentration was good" and he "followed along appropriately during the evaluation."  Dr. Brown noted that Daughtry wanted to "cease his appeals" because it "was his choice, his life, and that [he] would pay for his crime."  Daughtry indicated that his decision to withdraw his appeal was not due to "hearing voices."  He also indicated that his attorneys instructed him "not to work on the case."  During his meeting with Dr. Brown, Daughtry was able to list the books that he had read recently and to describe in detail his religious views.

Dr. Brown also described several letters Daughtry wrote Sally Gainey, the victim's mother.  In the letters, Daughtry expressed extreme remorse and an intention to ignore his counsels' advice not to meet Gainey and her family alone.  According to Dr. Brown,

nothing in the letters suggested that mental illness was driving Daughtry's decision to withdraw his appeal.

Dr. Brown diagnosed Daughtry as suffering from "Personality Disorder, NOS (Cluster B), . . . with episodes of depression and auditory hallucinations flowing from the Personality Disorder diagnosis during times of intense stress."  On the subject of Daughtry's competency, Dr. Brown concluded:

> It is clear that [Daughtry] understands the legal processes that he has faced and that he has the ability to function within the legal process if he chooses to do so.  There is not present a mental disease or defect that would cause him to be unable to meaningfully consult with attorneys if he chose to do so.  Mr. Daughtry has the necessary transactional abilities to proceed with post conviction appeals if he chose to do so. . . .  Mr. Daughtry is not mentally retarded and his diagnosed mental disorders and the medications he takes for them would not impair his ability to understand the appeals process in a factual and rational manner.  In short, his cognitive functioning is good.

> Mr. Daughtry understands the adversarial process.  He has the ability to disclose pertinent facts and to voice choices he has made, and his behavior at this time is not inappropriate or disorganized.  His decision to discontinue the appeals at this time, in my professional opinion to a reasonable degree of medical certainty, is not coerced by mental illness.  Therefore, with all relevant facts considered I am of the professional opinion to a reasonable degree of medical certainty, that Mr. Daughtry is seeking to waive his appeals in a knowingly and intelligent manner that is also voluntary in that it is free of coercion from mental illness.  He is not ambivalent about his choice to cease his appeals.  Mr. Daughtry believes that his [trial] was fair, and he seems to concur with the sentence given to him.  He has expressed remorse.  Mr. Daughtry is weary of life on death row, but he is not suicidal.  If by miracle the governor should pardon him, he would not seek to die.  Mr. Daughtry knows why the state is seeking to execute

him, and he understands the concept of death and the method of lethal injection.

On May 9, 2005, while the case was pending in the district court, Daughtry's counsel filed a motion in the district court requesting the court to declare moot all issues on remand based upon a letter written by Daughtry indicating that he wished to continue his appeal and was willing to assist his counsel in the appellate process. On June 3, 2005, the district court found that Daughtry was competent and wished to pursue his appeal. In reaching its decision, the court relied on Dr. Brown's evaluation and Daughtry's letter indicating that he did not wish to withdraw his appeal. After the case returned to this court, we granted Daughtry a certificate of appealability.

II

Daughtry first argues that the State withheld or suppressed critical crime scene evidence such that he was prejudiced during the guilt and sentencing phases of his trial in violation of Brady. According to Daughtry, the State withheld several reports by the investigating agents from the North Carolina State Bureau of Investigation (SBI), including the May 6, 1992 report by SBI Special Agent P. Duane Deaver and the April 20, 1992 and April 16, 1993 reports by SBI Special Agent W. Scott Worsham. In a nutshell, Daughtry claims that these reports would have provided the following materially exculpatory evidence: (1) the victim's shorts

- 16 -

and panties were soaked with urine; (2) additional logs containing blood were found at the crime scene; and (3) bicycle tire tracks were found near the victim's body.[3]

The prosecution's failure to disclose evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Moreover, the prosecutor's duty encompasses both impeachment and exculpatory

---

[3]We note that the Brady claim Daughtry presses in this court was not raised either in state court or the district court below. In state court, Daughtry's Brady claim alleged that the State withheld evidence concerning Sally Gainey's desire not to see Daughtry executed. Here, Daughtry's Brady claim relates to allegedly undisclosed SBI investigative reports. Obviously, Daughtry's failure to raise his present Brady claim in state court brings into play the principles of exhaustion and procedural default. Ordinarily, we are precluded from considering the merits of a defaulted claim absent a showing of cause and prejudice or a fundamental miscarriage of justice. See Harris v. Reed, 489 U.S. 255, 262 (1989). Moreover, Daughtry's failure to raise the claim in the court below is problematic, as this court usually does not entertain on appeal claims not raised below, see Singleton v. Wulff, 428 U.S. 106, 121 (1976) (noting the general rule that a federal appellate court does not consider an issue not addressed by the court below), and, at this late stage, Daughtry needs authorization from this court to file a successive petition to raise the claim, see 28 U.S.C. § 2244. As a result of the procedural posture of the case, Daughtry filed during the pendency of this appeal a motion to amend the record to include the allegedly undisclosed materials and a motion to remand the case to the district court to allow the court to address Daughtry's new Brady claim in the first instance. We grant Daughtry's motion to amend. However, we deny the motion to remand because, for the reasons stated in this opinion, Daughtry's Brady claim fails on the merits even if we accept his allegation that the allegedly undisclosed evidence was willfully or inadvertently withheld by the State. Because Daughtry's Brady claim fails on the merits, we need not tackle the procedural questions that arise from Daughtry's failure to raise this claim in state court or the court below.

evidence, and it includes evidence that is "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438 (1995). Along these lines, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf." Id. at 437. Significantly, a Brady violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Prejudice exists when there is a reasonable probability that, had the prosecution disclosed the suppressed evidence, the result of the trial would have been different. Id. at 289.[4]

As to the urine soaked shorts and panties, Special Agent Deaver's May 6, 1992 report indicates that the victim's shorts and panties, which were recovered near her body, were "wet[, and] smell[ed] of urine." According to Daughtry, had his trial counsel known that the shorts and panties were soaked with urine, his trial counsel would have been able to demonstrate that the victim was dead before her vaginal injuries occurred. According to Daughtry, if the sexual offense occurred after death, he was not only

---

[4]For purposes of our discussion, we will assume that the allegedly undisclosed evidence was willfully or inadvertently withheld by the State.

innocent of the sexual offense charge but also ineligible for the death penalty under the murder in the commission of a sexual offense aggravating circumstance.

With regard to this evidence, Daughtry has failed to show that the result of either phase of his trial would have been different had the evidence concerning the victim's shorts and panties been disclosed. First, we note that the North Carolina Supreme Court has rejected the argument that a sexual offense can only occur while the victim is alive. See State v. Thomas, 407 S.E.2d 141, 149-50 (N.C. 1991) (holding that a sexual offense can occur after death as long as the sexual offense and the death are so connected as to form a continuous chain of events). In Thomas, the defendant argued that the evidence was insufficient to support his felony murder conviction because the evidence established that the insertion of a telephone receiver into the victim's vagina occurred after her death. Id. at 148-49. The North Carolina Supreme Court rejected this claim, concluding that, "[b]ecause the sexual act was committed during a continuous transaction that began when the victim was alive, . . . the evidence was sufficient to support defendant's conviction for first-degree sexual offense." Id. at 149; see also id. at 150 ("While the first-degree sexual offense (the insertion of the receiver into her vagina) could have occurred before or after the victim's death, clearly, it occurred near the time of the victim's final demise during a continuous

- 19 -

transaction.").  In our case, the sexual offense, like the sexual offense in <u>Thomas</u>, was part of a continuous transaction.  Because the sexual offense in this case was committed as part of a continuous transaction, Daughtry was guilty of committing a sexual offense and eligible for the death penalty under the murder in the commission of a sexual offense aggravating circumstance.

Second, even if North Carolina recognized the principle that the sexual offense had to occur before death, the evidence concerning the urine soaked shorts and panties would have been of little help to Daughtry considering the evidence presented at his trial.  When asked whether a person at death is likely to "loose control of their bowels and bladder," Dr. Chancellor, who performed the autopsy on the victim, did not indicate that it was likely that a person loses control of either function.  In fact, in reference to bowel movements, Dr. Chancellor specifically stated that there was "no particular rule about that."  Considering this testimony, it is clear that the presence of urine on the victim's shorts and panties was immaterial to the question of when the victim died.  Moreover, the use of this evidence by Daughtry had an obvious downside.  It would have opened the door for the State to argue that Daughtry's actions on the night of the murder were so threatening that they caused the victim to wet her shorts and panties.  Thus, the use of this evidence obviously would have caused more harm than good.  In short, a review of the record leads

to the inescapable conclusion that Daughtry would have been convicted of capital murder and sentenced to death even if the evidence concerning the urine soaked shorts and panties was placed before the jury.

We now turn to Daughtry's claim that the State's alleged failure to disclose the evidence concerning the additional logs containing blood and the evidence concerning the bicycle tire tracks violated Brady. According to Daughtry, had this evidence been disclosed, his trial counsel would have been in a position to argue that the victim was either attacked by more than one person or that another person committed the sexual offense.

We harbor no doubt that, had the evidence concerning the additional logs and bicycle tire tracks been disclosed to the defense, the result of Daughtry's trial and sentencing would not have been different. The case against Daughtry was exceedingly strong. Daughtry's own testimony placed him at the crime scene. He testified that, immediately prior to the victim's death, they talked "a good 10, 15 minutes"; that the next thing he remembered was being "two or three blocks away"; that he "was real hyper [and] agitated"; that he "noticed there was a little bit of blood on [his] hand"; and that he wanted to go back to the Hopkins' residence to see "if she was okay, because she was the last person [he] was with."

Dr. Karen Chancellor testified that the victim suffered multiple bruises and abrasions to her head, face, and neck. The victim's lower jawbone was fractured in two places and the back of her scalp had four separate lacerations, each exposing bone. Dr. Chancellor also found multiple skull fractures, hemorrhaging around the brain and brain stem, and bruises of the brain tissue. Dr. Chancellor testified that both internal and external lacerations existed in and around the vagina and rectum. Further, the injuries around the rectal area were consistent with an object being rotated in the rectum. Dr. Chancellor opined that death resulted from blunt-force trauma to the head, the victim had been hit at least five times, and a log found at the scene could have been used to inflict the injuries.

Forensic evidence also tied Daughtry to the crime scene. Hair removed from the log was consistent with the victim's hair. Blood found on the log and on Daughtry's pants was the same type as the victim's blood but not the same as Daughtry's blood. Also, the results of DNA testing revealed that blood samples taken from the pants Daughtry wore on the night of the murder contained DNA material that matched the victim's DNA.

In view of all of this overwhelming evidence, the jury would have unhesitatingly rejected Daughtry's speculative assertion that somebody else (other than Daughtry and the victim) was present at the crime scene. There is no meaningful hair or blood evidence

suggesting that another person was present at the crime scene. Daughtry's own testimony in the case does not suggest that another person was present and, in fact, he openly acknowledged that he was the last person with the victim. In his confession, Daughtry indicated that he hit the victim, but did not know how many times he had done so. After Daughtry was told by Detective Fred Dees that he had inserted a "tree limb" into the victim's rectum, Daughtry cried and asked Lieutenant R.J. Cuddington "to place a bullet between his eyes." Given this evidence, it is understandable why the main thrust of Daughtry's defense centered on the lack of premeditation and deliberation. Finally, the additional logs and bicycle tire tracks evidence was of marginal, if any, exculpatory value. The blood stains found on the additional logs is not surprising considering that Detective Walter Martin found the three-inch-thick log containing the victim's blood and strands of her hair atop a woodpile a short distance from the victim's body. The presence of bicycle tire tracks found at the crime scene was not surprising when one considers that the location of the tracks was near the entrance of the apartment. Thus, while this evidence was at best of marginal exculpatory value if introduced, the jury would not have placed reliance on such speculative evidence to conclude that there was another person present at the crime scene.

In sum, when one considers the cumulative effect of all of the allegedly undisclosed exculpatory or impeachment evidence and the role it would have played in the trial, it simply cannot be said that there is a reasonable probability of a different result during either phase of Daughtry's trial. Cf. Strickler, 527 U.S. at 291-96 (denying relief where, in light of the considerable forensic and other physical evidence linking petitioner to the crime, petitioner did not show a reasonable probability of a different outcome had the suppressed evidence been disclosed).[5]

---

[5]Daughtry also restates his Brady claim as a claim under North Carolina law. According to Daughtry, the State withheld materially exculpatory or impeachment evidence from Daughtry's trial and post-conviction counsel in violation of North Carolina General Statute § 15A-1415(f), which, among other things, requires the "State, to the extent allowed by law, [to] make available to the capital defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant." Unfortunately for Daughtry, a federal court may grant habeas relief only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2254(a); see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Because Daughtry's § 15A-1415(f) claim rests solely upon an interpretation of North Carolina case law and statutes, it is simply not cognizable on federal habeas review. See Wright v. Angelone, 151 F.3d 151, 157-58 (4th Cir. 1998) (refusing to entertain under Virginia law the petitioner's claim that the state trial court lacked jurisdiction over two counts of petitioner's indictment); Smith v. Moore, 137 F.3d 808, 822 (4th Cir. 1998) (refusing to entertain claim that jury instruction misstated South Carolina law).

III

Daughtry also claims that the competency determinations made in state court (on October 24, 1996 and July 1, 1997) were unreasonable under clearly established federal law as determined by the Supreme Court. We disagree.

We may grant a habeas petition with respect to any claim adjudicated on the merits in state court only if the state court decision was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court or the decision was based on an unreasonable application of the facts. Robinson v. Polk, 438 F.3d 350, 354-55 (4th Cir. 2006). "A decision of a state court is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." Id. at 355 (citation, internal quotation marks, and alterations omitted). "A state court adjudication is an unreasonable application of federal law when the state court correctly identifies the governing legal rule from the Supreme Court's cases but applies it unreasonably to the facts of a particular case or applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable or fails to apply the principle of a precedent in a

context where such failure is unreasonable." Id. at 355 (citations, internal quotation marks, and alterations omitted).

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. Pate v. Robinson, 383 U.S. 375, 384-86 (1966).[6] The test for determining competency is whether "[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). "'Not every manifestation of mental illness demonstrates incompetence . . . ; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" Burket v. Angelone, 208 F.3d 172, 192 (4th Cir. 2000) (quoting United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir. 1984)). Similarly, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence." Burket, 208 F.3d at 192.[7]

---

[6]The Constitution also prohibits the execution of the insane. See Ford v. Wainwright, 477 U.S. 399 (1986). Daughtry does not raise a Ford claim at this time and, therefore, we need not address whether he is competent to be executed.

[7]We note that the Supreme Court has not conclusively resolved the question of whether a person being held under a sentence of death has a right to be competent to pursue collateral review of a state conviction in state court. The constitutional requirement of competence to stand trial certainly does not imply a coordinate requirement on collateral review, as habeas is a "secondary and

Whether a defendant is competent is a question of fact. See Mackey v. Dutton, 217 F.3d 399, 412 (6th Cir. 2000) (competency to stand trial). We also must accord the state court's determination that Daughtry was competent to assist counsel a presumption of correctness under 28 U.S.C. § 2254(e)(1). See Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (concluding that a state court's competency determination is entitled to a presumption of correctness on federal habeas review). Thus, "we presume the [state] court's factual findings to be sound unless [Daughtry] rebuts the 'presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 125 S. Ct. 2317, 2325 (2005) (quoting 28 U.S.C. § 2254(e)(1)).

In this case, on two occasions, the Johnston County Superior Court found Daughtry competent to assist his counsel on post-conviction review. With regard to the October 24, 1996 competency determination, on the one hand, there was ample evidence before the Johnston County Superior Court indicating that Daughtry had the ability to communicate and assist counsel. Dr. Rollins noted that

---

limited" component of the criminal justice process, Barefoot v. Estelle, 463 U.S. 880, 887 (1983), where many of the defendant's rights no longer attach, like the right to counsel. See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) (holding that there is no constitutional right to counsel on habeas). However, for purposes of our discussion, we will assume that clearly established federal law as determined by the Supreme Court requires that a capital habeas petitioner be competent on state habeas to assist his state habeas counsel. This assumption is of no help to Daughtry, because, for the reasons stated in the opinion, Daughtry's competency claim fails on the merits.

Daughtry's speech was "clear" and that his thinking was "organized." He also noted that Daughtry's perception, concentration, orientation, memory, and intellectual functions were "intact." Dr. Rollins also noted that Daughtry understood "his position with regard to the law and the nature and object of the proceedings against him." Dr. Rollins also could not rule out malingering as a cause for Daughtry's auditory hallucinations. The "record of contact," authored by Dr. Baloch (Daughtry's treating psychiatrist) less than two weeks prior to the time Daughtry filed his "Motion to Cancel Appeal," found that Daughtry: (1) "denied any symptoms"; (2) was "clinically stable"; (3) "denied auditory and visual hallucinations"; (4) denied "suicidal or homicidal ideations"; (5) denied depression; and (5) had a stable mood. Finally, when questioned by the court at the hearing, Daughtry expressed his verbal assent to having counsel represent him fully in post-conviction proceedings, but, when asked if he wanted to proceed with his "Motion to Cancel Appeal," Daughtry refused to answer or in any way respond to the court.

On the other hand, there was evidence before the Johnston County Superior Court suggesting that Daughtry was unable to assist his counsel. Dr. Rollins diagnosed Daughtry as having major depression with psychotic features. Dr. Rollins found that Daughtry's alleged auditory hallucinations impaired Daughtry's ability to assist counsel.

In this case, the Johnston County Superior Court took testimony, weighed the evidence, found that Daughtry was willfully refusing to assist his post-conviction counsel in order to delay his post-conviction proceeding, and concluded that Daughtry was competent and able to assist his post-conviction counsel. Obviously, the court was in the best position to make credibility determinations, assess the probative value of the evidence, and resolve conflicts in the evidence. The evidence in the record, as credited by the court, unquestionably supports the court's conclusion that Daughtry was competent and able to assist his post-conviction counsel. Thus, Daughtry has failed to rebut the court's October 24 1996 competency finding by clear and convincing evidence.

With regard to the July 1, 1997 competency determination, again, on the one hand, there was ample evidence before the Johnston County Superior Court indicating that Daughtry had the ability to communicate and assist counsel. At the hearing, Dr. Bellard testified that Daughtry was able to understand the nature and the object of the proceedings against him and was aware of his surroundings, the reason he was in prison, and the reason he was sentenced to death. Dr. Bellard also found Daughtry's memory to be intact and that Daughtry had low to normal intelligence.

Dr. Bellard also testified as to Daughtry's ability to consult with counsel. Although Dr. Bellard testified that alleged auditory

hallucinations were one reason Daughtry wanted to end his appeals, Daughtry also gave him clear and rational reasons to end his appeals apart from any voices; for example, Daughtry indicated that he wanted to end his appeals because: (1) "he didn't see any sense in" appealing; (2) "he wanted an end to the waiting"; and (3) the appeals were "taking a toll on his family." Like Dr. Rollins, Dr. Bellard was unable to determine whether Daughtry was truthful about the voices he heard. The state court asked if a motive for Daughtry's malingering could be to forestall the death penalty, to which Dr. Bellard answered in the affirmative.

At the June 30, 1997 hearing, the State introduced the testimony of Sally Gainey, the victim's mother. As a result of a letter from Daughtry, Gainey visited Daughtry at Central Prison in February 1997. During her conversation with Daughtry, Gainey detected no difference in Daughtry's demeanor from the Daughtry she had always known. Daughtry also told Gainey that he was not going to help his attorneys with his post-conviction proceeding.

On the other hand, there was evidence before the Johnston County Superior Court suggesting that Daughtry was unable to assist his counsel. Dr. Bellard testified that Daughtry was unable to assist his defense in a rational or reasonable manner because of his ambivalence about going forward with his appeals or ending them and being executed. According to Dr. Bellard, Daughtry's ambivalence was "complicated" by his depression and auditory

hallucinations.  Dr. Bellard also testified that Daughtry "hasn't demonstrated an ability to be consistent about what is before him and how to work with attorneys."  He added that Daughtry "is unclear about what he wishes to do, and I believe, is unclear about the role he may or may not play in all this."  Finally, Dr. Bellard indicated that he believed that Daughtry was being honest when he indicated that he was suffering from auditory hallucinations.

Like the October 24, 1996 competency determination, we cannot disturb the Johnston County Superior Court's July 1, 1997 competency determination.  There was evidence before the court that allowed it to find that Daughtry was making a deliberate choice not to cooperate with his post-conviction counsel.  While the auditory hallucinations were one explanation for Daughtry's decision not to assist his post-conviction counsel, there were other reasons, that if credited, would support the court's competency determination. Unquestionably, the court was at liberty to conclude that the alleged auditory hallucinations did not undermine Daughtry's ability to assist his counsel.  Thus, it cannot be said that Daughtry has rebutted by clear and convincing evidence the court's July 1, 1997 competency determination.

IV

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED